## STATE OF CONNECTICUT *v.* RHODERICK BOYD
## (AC 25174)

Schaller, Bishop and Dupont, Js.

Argued December 7, 2004—officially released May 17, 2005

*Mark Rademacher*, assistant public defender, with whom, on the brief, were *Moira L. Buckley*, former assistant public defender, and *Elizabeth Duryea* and *Juli Reitter*, certified legal interns, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Vicki Melchiorre*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Rhoderick Boyd, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and assault in the third degree in violation of General Statutes § 53a-61 (a) (1). On appeal, the

defendant claims that (1) the trial court improperly deprived him of his right to confront and to cross-examine the state's expert witnesses, (2) the court improperly failed to strike expert testimony that the victim was sexually assaulted, (3) the court improperly denied the defendant's motion for a new trial and (4) he was denied due process of law as a result of prosecutorial misconduct. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the fall of 1999, the sixteen year old victim attended a boarding school in Connecticut.[1] In addition to attending classes, she worked in the dining hall as a dishwasher under the supervision of employees of Aramark Corporation, the company responsible for providing food service to the school. The defendant, an Aramark Corporation employee, was one of the victim's supervisors, and they worked together on the same evening shift once per week. On several occasions, the defendant, who was in his thirties, asked if he could contact her outside of work, complimented her appearance and touched her without her permission. This unwanted attention made the victim feel uncomfortable, and she did not want to be alone with the defendant.[2]

On the evening of the assault, the victim was scheduled for a two hour shift. Near the end of her shift, the defendant instructed the victim to go downstairs to clean large pots and pans. The defendant grabbed the victim's arm and escorted her into the elevator leading

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom her identity may be ascertained. See General Statutes § 54-86e.

[2] M, a student who also worked in the dining hall, observed the defendant speaking with the victim and noticed that the victim appeared to be uncomfortable. She also overheard the defendant ask the victim for her telephone number.

to the lower level. After leaving the elevator, the defendant told the victim to "shut up and stand still" and grabbed her upper arms tightly. The victim screamed, and the defendant responded by slapping her in the face. He then removed the victim's clothes and his pants, and forced her to touch his penis. He fondled the victim, performed oral sex on her and penetrated her with his finger. At some point, the victim screamed, and the defendant grabbed her hair and slammed her head against the tile floor, causing her to lose consciousness. The victim regained consciousness and observed that the defendant had ejaculated on her stomach, causing her to scream again. The defendant again hit her head against the ground, causing her to lose consciousness for a second time. When the victim recovered, the defendant, who had dressed, told her to return upstairs in five minutes and to not tell anyone what had happened. The victim subsequently returned to her dormitory room and took a shower.[3]

On the day following the assault, the victim participated in a school volleyball game. During the game, she fell to the ground, striking her head. Following her fall, the victim was unable to move. An ambulance transported her to a hospital, where she received treatment. Thereafter, she returned to her parents' home.[4] The victim had regained movement in her arms while in the hospital, but was unable to move her legs for several days.

---

[3] S, an adult employee at the boarding school and the victim's adviser, performed a routine dormitory check and observed the victim after the assault. S testified that the victim was not her usual self and that the victim asked if she could change employment because a man had been bothering her and making her feel uncomfortable.

[4] A, a teacher at the boarding school and the volleyball coach, stayed with the victim in the hospital. A testified that the victim had told her that a man had been bothering her in the dining hall by asking for her telephone number and making inappropriate comments. The victim also informed A that she did not want to return to her job in the dining hall and that she was worried about the other girls who worked there.

At some point following the assault, the defendant's supervisor, Steven Chmura, learned that the defendant had asked a student for her telephone number. The defendant denied that this had occurred and instead asserted that he had asked the student how someone could reach her. As a result of this admission, Chmura suspended the defendant with pay. After further investigation into the matter, the defendant's employment with Aramark Corporation was terminated.

In January, 2000, the victim, who had returned to the boarding school, found a note in her school mailbox. The note read, "Whore, you told, I said *not* to!" (Emphasis added.) The victim reported this incident to the dean of the school. The defendant's neighbor, Lawrence Mounds had driven the defendant to the school in the winter after the termination of the defendant's employment.[5] The defendant had told him that he had a meeting with "people at the school." No other witness confirmed the existence of this meeting.

After receiving the note, the victim met with Patricia Sullivan, a police detective, who commenced an investigation after taking the victim's statement. Sullivan and Mark Francis, a police lieutenant, arrived at the defendant's home and asked him if they could talk with him. They informed him that they wanted to discuss an incident at the school that had occurred in the fall of 1999. The defendant, without prompting, responded, "What, a rape?" The defendant agreed to accompany the officers to the police station and stated that he may have said something that was not "right" to one of the students. After speaking with his wife, however, he declined to go to the police station.

The defendant was arrested, tried and convicted on all counts. The court sentenced the defendant to an

---

[5] Mounds also testified that the defendant had made comments regarding the appearance of the girls at the school.

effective prison term of eighteen years incarceration, suspended after fourteen years, and twenty-five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly deprived him of his right to confront and to cross-examine the state's expert witnesses. Specifically, the defendant argues that the court improperly failed to release certain medical records to him concerning the victim. We agree with the defendant that because the state had been allowed to review these records, they should have been disclosed to the defendant also. We conclude, however, that such error was harmless beyond a reasonable doubt.

The following additional facts are necessary for the resolution of the defendant's claim. Lucy Puryear, a psychiatrist who had treated the victim, was called by the state as a witness and was qualified as an expert in psychiatry and neurology. Prior to her testimony, the court stated that, as discussed in a chambers conference with counsel, Puryear's progress notes concerning the assault required redaction. In the absence of the jury, the court stated for the record that certain portions of the progress notes had been redacted and that the redacted notes had been furnished to the defendant. The court marked the original document as a court's exhibit. The court informed both parties that its ruling was preliminary in nature and that if it was required as a result of Puryear's testimony, additional portions of the notes would be disclosed to the defendant as well.

Puryear testified that she had treated the victim for various illnesses, including post-traumatic stress disorder.[6] She first saw the victim in April, 2001. Puryear

---

[6] Puryear noted that the victim also suffered from a major depressive disorder, an eating disorder and a generalized anxiety disorder.

explained that post-traumatic stress disorder "is a psychiatric diagnosis that is given to patients with a specific set of symptoms. The symptoms have to occur after a life threatening trauma, and . . . the person has to be in intense fear, fear for their life, something life threatening." The symptoms of post-traumatic stress disorder, most of which the victim exhibited, include emotional numbing, recurrent nightmares about the event, intrusive thoughts about the traumatic event, flashbacks and being easily scared or startled. Another key symptom of post-traumatic stress disorder is the loss of details regarding the traumatic event. Individuals suffering from post-traumatic stress disorder often refrain from discussing all of the details of the traumatic event at the same time. Furthermore, it is common for such individuals to recall certain details at different times or not to reveal explicit details to others unless a certain comfort level is achieved. Puryear testified that the victim did not have any mental problems prior to the sexual assault.

Puryear also explained the victim's inability to move her arms and legs following her fall during the volleyball game. She testified that she had reviewed the victim's medical records and concluded that her inability to move was not due to a physical injury, but rather was a conversion disorder. According to Puryear, conversion disorder, a coping mechanism, occurs after an intense emotional response following a traumatic event where the person transfers those emotions or feelings into a physical symptom, such as paralysis. This response usually occurs a short time after the traumatic event but does not manifest itself immediately.

Outside of the presence of the jury, defense counsel asked Puryear about a notation in her progress notes regarding "family stressors" that occurred prior to the assault. These stressors involved certain difficulties facing the victim's sibling. In Puryear's medical opinion,

these stressors had nothing to do with the victim's recollection of the assault. Defense counsel continued to inquire about the victim's relationship with her family, and Puryear testified unequivocally that the victim's familial issues were unrelated to the symptoms of post-traumatic stress disorder.

After the jury returned, Puryear stated that, in her progress notes, she had indicated the presence of family stressors that had existed prior to the assault and that the victim was frustrated and angry with her parents. On redirect examination, Puryear reiterated that the family stressors were totally unrelated to the victim's post-traumatic stress disorder symptoms.

The state also called John B. Thomas, Jr., a psychiatric social worker, as a witness. The victim had been referred to Thomas and began treating with him in December, 1999. The victim complained of various symptoms, including anxiety, nervousness, difficulty sleeping and fearfulness. Prior to the start of Thomas' testimony the next day, the court noted that it previously had redacted Thomas' handwritten notes of his interviews with the victim. The court stated that it "did not feel at this point that the matters [that were redacted] were subject to disclosure, recognizing that a privilege covers these notes. And much of it, in my view, does not pertain to information regarding the complaining witness, but information relayed by the complaining witness to the therapist relative to other family members. So, I did indicate that my view might change as we go on and I hear more evidence."

Thomas testified that he saw the victim after she received the note in her school mailbox, which terrified her. On cross-examination, he stated that it was usual for a victim of sexual assault not to disclose everything right away and that his role was to provide therapy,

not conduct an investigation by obtaining all of the details regarding the assault.

At the outset of our analysis, we note that prior to the testimony of Puryear and Thomas, the court inquired whether any issues would be raised regarding the victim's confidential medical records. The court referenced *State* v. *Esposito*, 192 Conn. 166, 471 A.2d 949 (1984), and inquired whether the procedure for in camera review outlined in that case would be necessary. The prosecutor represented that the victim had consented to a review of the notes by both the state and the court through an in camera inspection. The victim also agreed that, following the court's review, the appropriate information contained in the notes as determined by the court could then be turned over to the defendant.[7]

---

[7] The prosecutor reported to the court that the victim had provided an oral waiver authorizing review of the notes by both the state and the court.

General Statutes § 52-146e provides in relevant part: "(a) All communications and records as defined in section 52-146d shall be confidential [and] no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative.

"(b) Any consent given to waive the confidentiality shall specify to what person or agency the information is to be disclosed and to what use it will be put. . . ."

As defined in General Statutes § 52-146d (3), consent "means *consent given in writing by the patient* or his authorized representative . . . ." (Emphasis added.) Thus, it appears that the prosecutor should have obtained the written consent of the victim, rather than her oral consent. The parties have not raised this issue, and we believe that it is not material to our discussion.

We also note that the victim limited her consent to the disclosure of records that the court determined were necessary to be turned over to the defendant. The court never made this determination. We are mindful that "[t]he people of this state enjoy a broad privilege in the confidentiality of their psychiatric communications and records . . . and the principal purpose of that privilege is to give the patient an incentive to make full disclosure to a physician in order to obtain effective treatment free from the embarrassment and invasion of privacy which could result from a doctor's testimony." (Citation omitted; internal quotation marks omitted.) *Falco* v. *Institute of Living*, 254 Conn. 321, 328, 757 A.2d 571 (2000). Because it is unnecessary to do so, we decline the opportunity to reveal the specific

In *Esposito*, our Supreme Court established the procedure for determining whether confidential psychiatric records should be turned over to the defendant for purposes of cross-examination. The court recognized the inherent tension between a patient's privacy interest concerning his or her medical records; see General Statutes § 52-146e; and the defendant's constitutional right to confront and to cross-examine the state's witnesses. In order to balance these competing interests, the court developed the following procedure. "If . . . the claimed impeaching information is privileged there must be a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the court may be obliged to strike the testimony of the witness. If the consent is limited to an in camera inspection and such inspection, in the opinion of the trial judge, does not disclose relevant material then the resealed record is to be made available for inspection on appellate review. If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to the release of such material to the defendant or to face having her testimony stricken in the event of refusal." Id., 179–80; see also *State* v. *D'Ambrosio*, 212 Conn. 50, 55–59, 561 A.2d 422 (1989), cert.

information contained in the confidential records, even though they ultimately should have been disclosed to the defendant. We do this to protect the limited scope of the consent given by the victim in this case.

denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990); *State* v. *Webb*, 75 Conn. App. 447, 456–57, 817 A.2d 122, cert. denied, 263 Conn. 919, 822 A.2d 244 (2003); see also *State* v. *Kulmac*, 230 Conn. 43, 57–59, 644 A.2d 887 (1994) (same procedure used for department of children and families records).

In the present case, in addition to the court's in camera review, the prosecutor also had access to and reviewed the unredacted notes of Puryear and Thomas. Thus, our resolution of this issue is controlled not by *Esposito* and its progeny, but by our recent decisions in *State* v. *Palladino*, 69 Conn. App. 630, 796 A.2d 577 (2002), and *State* v. *Sells*, 82 Conn. App. 332, 844 A.2d 235, cert. denied, 270 Conn. 911, 853 A.2d 529 (2004).[8]

In *Palladino*, the defendant was convicted of sexually assaulting a prison inmate. *State* v. *Palladino*, supra, 69 Conn. App. 631. The victim testified as a witness for the state and, during cross-examination, admitted to a past diagnosis of multiple personality disorder. Id., 632. Defense counsel attempted to obtain her psychiatric records. Despite the victim's unconditional waiver with respect to her psychiatric records, the court proceeded with an in camera review, adhering to the *Esposito* procedure. Id., 634–35. In resolving the defendant's appeal, we stated that "neither our Supreme Court nor this court has held that such an in camera review is necessary where a victim freely gives up any rights to confidentiality that she might otherwise have." Id., 636. We concluded that "[w]*here the state's complaining witness has freely agreed to the use of her psychiatric records . . . we conclude that there is no further initial gatekeeping role for the court. . . .* The court improperly refused to release all of the psychiatric records to the defendant, which he had subpoenaed to the court." (Emphasis added.) Id., 637.

[8] We note that both *Palladino* and *Sells* were decided after the defendant's trial.

Similarly, in *State* v. *Sells*, supra, 82 Conn. App. 334, the defendant appealed following his conviction of risk of injury to a child and sexual assault in the second degree. The victim in that case underwent a cognitive and psychological evaluation, and a written report was issued. Id., 344. Prior to the start of the trial, the state had obtained a waiver from the victim's guardian, permitting the disclosure to the prosecutor of the victim's school records, records from the department of children and families, and the psychological report. Id., 344–45. After the prosecutor reviewed these records, he submitted them to the court for an in camera review. Id., 345. Following that review, the court refused to disclose the psychological report to the defendant. Id. We again held that the *Esposito* gatekeeping procedure does not apply where the complainant has waived his rights to confidentiality, and the records in question have been turned over and reviewed by the prosecutor's office and the records should have been disclosed to the defendant. Id., 347.

In the present case, the victim orally waived her right to confidentiality, and turned the Puryear and Thomas notes over to the prosecutor, who was able to review them. It was improper at that point for the court to conduct an in camera review of the notes; the notes simply should have been turned over to the defendant.[9]

Following the course taken in *Palladino* and *Sells*, we focus our inquiry on the impact of the court's refusal to release the unredacted notes to the defendant. In engaging in such analysis, we are required to review the notes and to consider how the information contained in them relates to the defendant's constitutional rights. See id.; *State* v. *Palladino*, supra, 69 Conn. App. 638. If

---

[9] Due to a misunderstanding in the clerk's office, appellate counsel for the defendant was able to review the sealed documents. Upon realizing this error, the defendant's counsel filed a motion for rectification, which the court granted, and the records were resealed.

the refusal to turn the unredacted notes over to the defendant is harmless, the defendant is not entitled to a new trial. In this case, because the error concerns the right to cross-examine witnesses and is of constitutional magnitude, the state bears the burden of proving that the violation was harmless beyond a reasonable doubt. "The correct inquiry for identifying harmless constitutional error is to ask whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 333, 618 A.2d 32 (1992).

The victim's testimony at trial contained several inconsistencies relative to her pretrial statements to other witnesses, the police and her medical providers. As the defendant points out in his appellate brief, the victim told the police that the defendant, at the time of the assault, was wearing underwear, but on direct examination, she testified that he was not wearing underwear. Additionally, T, a classmate at the boarding school, testified that the victim had told her that she had been forced to perform oral sex on the defendant. The victim, however, told her therapist that she had no recollection of this or of whether the defendant had penetrated her.[10] There were also inconsistencies

---

[10] We note that the victim testified that she told Thomas only some of the details of the assault and that that was only after she "felt safe" with him. She later clearly indicated to the jury that there was no doubt in her mind

regarding the timing of when the defendant slapped the victim and forced her head to the floor. As these examples demonstrate, defense counsel vigorously cross-examined the state's witnesses and challenged their credibility before the jury.

The state utilized Puryear and Thomas, who had treated the victim and were testifying as expert witnesses, to provide the jury with an explanation for the inconsistent statements of the victim. They informed the jury that it was common for an individual suffering from post-traumatic stress disorder or for a recent sexual assault victim to recall the events of the traumatic event in a nonlinear fashion and not to disclose all of the details every time the victim spoke of the assault. Furthermore, it was not unusual for a sexual assault victim not to disclose to a third person all of the intimate details regarding the attack until a certain trust and comfort level were achieved.

We are faced with a situation in which the victim's privacy rights must be considered relative to the defendant's constitutional right to cross-examination. "A defendant's right to a public trial is guaranteed in all criminal proceedings by the sixth amendment to the United States constitution. . . . This right is made applicable to the states through the fourteenth amendment . . . and also is encompassed in article first, § 8, of the Connecticut constitution." (Internal quotation marks omitted.) *State* v. *Eric M.*, 79 Conn. App. 91, 96, 829 A.2d 439 (2003), aff'd, 271 Conn. 641, 858 A.2d 767 (2004).[11] "The primary interest secured by confrontation

that the defendant had penetrated her, slapped her in the face and molested her. Thomas stated that during his first session with the victim, she told him that she did not know if she had been penetrated, but had been raped. He also informed the jury that the victim told him bits and pieces of the assault over the course of the therapy sessions, but had never given him a completely detailed chronological narrative.

[11] "Because the defendant has not briefed his claim separately under the Connecticut constitution, we limit our review to the United States constitution. We have repeatedly apprised litigants that we will not entertain a

is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Internal quotation marks omitted.) *State* v. *Pierre*, 83 Conn. App. 28, 39, 847 A.2d 1064, cert. granted on other grounds, 270 Conn. 916, 853 A.2d 530 (2004). Put another way, "[t]he defendant's right to confront witnesses against him is not absolute, but must bow to other legitimate interests in the criminal trial process." (Internal quotation marks omitted.) *State* v. *DeJesus*, 270 Conn. 826, 836, 856 A.2d 345 (2004).

Our review of the record and the original notes of Puryear and Thomas leads us to the conclusion that the refusal to provide the defendant with the unredacted notes was harmless beyond a reasonable doubt. The defendant extensively cross-examined the victim in order to undermine her credibility before the jury. Additionally, the defendant challenged the opinions of Puryear and Thomas with respect to the victim's inconsistencies. The defendant's primary argument appears to be that the information contained in the notes would have revealed another source of the symptoms of post-traumatic stress disorder exhibited by the victim, primarily the family stressors. We carefully and critically reviewed the notes and conclude that no such

state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Diaz*, 86 Conn. App. 244, 251 n.3, 860 A.2d 791 (2004), cert. denied, 273 Conn. 908, 870 A.2d 1081 (2005).

evidence exists. Puryear unequivocally stated before the jury that these family stressors were unrelated to the victim's post-traumatic stress disorder symptoms, and the jury heard evidence that the victim had not exhibited any signs of mental illness until after the assault. Additionally, the defendant questioned Puryear regarding the victim's relationship with her family, her use of marijuana and her school history. Moreover, outside of the presence of the jury, Puryear stated that the stress in the victim's family concerned the difficulties that one of her siblings was experiencing and did not directly impact the victim. Likewise, the redacted section of Thomas' notes concerned the specifics of the victim's sibling's difficulties and were not directly related to the victim.

Having reviewed the materials with full consideration of the damaging potential of cross-examination by the defendant with the benefit of the unredacted notes, we are convinced that such error was harmless beyond a reasonable doubt. Because the defendant took full advantage of the numerous inconsistencies with respect to the victim's testimony, any additional attempt to impeach her credibility would have been cumulative. Further, any information about the troubles of the victim's sibling constituted a relatively minor point in the case, as Puryear made it abundantly clear that those troubles were unrelated to the victim. There was nothing in the redacted materials to undermine the expert opinion that the post-traumatic stress disorder symptoms were unrelated to the family stressors.

In short, although the unredacted notes written by Puryear and Thomas should have been provided to the defendant and could have provided some material for cross-examination, we conclude that such error was harmless beyond a reasonable doubt. Accordingly, this claim must fail.

## II

The defendant next claims that the court improperly failed to strike testimony that the victim was sexually assaulted. Specifically, he argues that the court, sua sponte, should have struck Puryear's testimony that the victim had been sexually assaulted. Although the defendant requests that we review his claim under either *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[12] or the plain error doctrine; see Practice Book § 60-5;[13] we conclude that such review is unwarranted and not appropriate in this case.

The following additional facts are necessary to demonstrate why we will not review this issue. During direct examination, Puryear testified in relevant part as follows:

"[The Prosecutor]: All right. When did [the victim] start having problems . . . ?

"[The Witness]: [The victim] started having problems after the incident.

"[The Prosecutor]: October 21, 1999?

"[The Witness]: Correct.

"[The Prosecutor]: And did she have any history of mental problems before the sexual assault?

"[The Witness]: No, she didn't."

Puryear subsequently stated that the victim's inability to move following her fall on the volleyball court was "related to the sexual assault the day before . . . . "

---

[12] The defendant concedes that he did not preserve his claim at trial for appellate review. We also note that the four *Golding* prongs are well known, and we need not recite them here.

[13] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

On appeal, the defendant characterizes Puryear's statement that the victim was sexually assaulted as improper expert testimony. He further contends that this testimony conveyed the impression to the jury that Puryear believed an actual, rather than an alleged, sexual assault had occurred.

The defendant relies primarily on *State* v. *Grenier*, 257 Conn. 797, 778 A.2d 159 (2001). In that case, our Supreme Court held that certain expert testimony concerning the victim's truthfulness was improper and should have been stricken *following the defendant's timely objection.* Id., 806. In the present case, however, there was no objection to Puryear's testimony and, therefore, *Grenier* is inapposite.

We are persuaded that *State* v. *Toccaline*, 258 Conn. 542, 547–48, 783 A.2d 450 (2001), provides us with the proper guidance. In that case, a licensed clinical social worker opined that the victim had been sexually assaulted by the defendant. The social worker based this opinion on his discussions with the victim. Id., 548. Finally, the social worker testified that he believed that the victim had been truthful. Id.

The defendant failed to object to the social worker's testimony. This fatal flaw precluded appellate review and distinguished the case from *Grenier*, in which similar testimony had been objected to and entitled that defendant to a new trial. Id., 550–52. "The defendant is not entitled to [review] under *Golding* because his claim does not raise a constitutional issue. *In essence, the defendant attempts to put a constitutional tag on a nonconstitutional evidentiary ruling. . . .* We previously have stated that the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved. . . . The trial court's exercise of discretion in admitting

expert testimony is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law. . . . *The errors claimed by the defendant . . . are simply evidentiary in nature.* Although the trial court, upon proper objection by the defendant, would have been required to exclude this testimony, the presentation of [the social worker's] statements to the jury in the absence of such an objection did not implicate a constitutional right or result in a fundamentally unfair trial." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 550–51; see *State* v. *Carneiro*, 76 Conn. App. 425, 429–31, 820 A.2d 1053, cert. denied, 264 Conn. 909, 826 A.2d 180, cert. denied, 540 U.S. 915, 124 S. Ct. 304, 157 L. Ed. 2d 208 (2003).

In an attempt to distinguish the present case from appellate precedent, the defendant argues simultaneously that the court should have stricken Puryear's comments and that his constitutional right to cross-examine Puryear was infringed on by the court's failure to release the progress notes to him. The defendant seeks to somehow link the court's failure to strike the testimony of Puryear with his constitutional claim concerning cross-examination. The thrust of this argument is that the court improperly failed to strike the challenged testimony, which simply is not related to the claim of an improper limitation of cross-examination. As we have stated, "[R]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Internal quotation marks omitted.) *State* v. *Izzo*, 82 Conn. App. 285, 291 n.2, 843 A.2d 661, cert. denied, 270 Conn. 902, 853 A.2d 521 (2004). In short, we are not

persuaded by the defendant's attempt to transform this evidentiary claim into one of constitutional magnitude.

"[O]ur Supreme Court has stated that once identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed." (Internal quotation marks omitted.) *State* v. *Warren*, 83 Conn. App. 446, 451, 850 A.2d 1086, cert. denied, 271 Conn. 907, 859 A.2d 567 (2004). We conclude, therefore, that the defendant's claim fails under the second *Golding* prong.[14]

The defendant also requests review pursuant to the plain error doctrine. "[R]eview under the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [T]he core of the plain error doctrine . . . concerns whether a defendant can prevail on the merits of a claim, not simply whether the claim can be reviewed. . . . Consequently, [w]here a trial court's action does not result in any manifest injustice, a defendant's claim under the plain error doctrine does not warrant review." (Citations omitted; internal quotation marks omitted.) *State* v. *Moore*, 85 Conn. App. 7, 11, 855 A.2d 1006, cert. denied, 271 Conn. 937, 861 A.2d 510 (2004).

Our Supreme Court declined to afford the defendant plain error review in *Toccaline*. *State* v. *Toccaline*, supra, 258 Conn. 552; see also *State* v. *Carneiro*, supra, 76 Conn. App. 431. Likewise, in the present case, we will not review this evidentiary claim under the plain error doctrine.

---

[14] Although perhaps the court would have been required to strike this portion of Puryear's testimony after a proper objection, we cannot conclude that the defendant's constitutional rights were implicated or that the defendant received a fundamentally unfair trial. See *State* v. *Toccaline*, supra, 258 Conn. 550–51.

## III

The defendant next claims that the court improperly denied his motion for a new trial. Specifically, the defendant argues that the state failed to disclose exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and, therefore, he is entitled to a new trial. We are not persuaded.

The following additional facts are necessary for the resolution of the defendant's claim. Following the conclusion of his trial, the defendant, on August 17, 2001, filed a motion for a new trial pursuant to Practice Book § 42-53.[15] The court held a hearing on the defendant's motion on November 16, 2001. During the argument, defense counsel raised the issue of records pertaining to the victim's three week inpatient treatment at a psychiatric clinic.[16] The prosecutor stated that she had those records and was willing to submit them to the court for an in camera review. Defense counsel requested the court to review the clinic's records. The court then continued the matter until November 30, 2001.

The court received the clinic records prior to the November 30, 2001 hearing. Defense counsel again requested that the court review these records. At that point, the prosecutor stated that she not only had possession of these records during the trial, but also that she had reviewed them as well. She also informed the court that the clinic records contained "information that would be potentially exculpatory." Specifically, she discovered information that could have been used to impeach the credibility of the victim; however, "[t]here

---

[15] The defendant also filed a motion for a judgment of acquittal, which the court denied.

[16] Counsel for the defendant stated at the hearing that he became aware of these records during his cross-examination of Puryear during the trial. The prosecutor argued that the defendant, through his counsel, had been aware of the victim's inpatient treatment prior to the start of the trial.

is nothing exculpatory along the lines of 'it wasn't him' or 'it didn't happen.' " The prosecutor, therefore, opined that such information was not material within *Brady* and, thus, a new trial was not warranted on the basis of a *Brady* violation. She then requested that the court review the clinic records. Finally, the prosecutor represented that the victim had consented to the court's review of the clinic records. The court, pursuant to the explicit request of both parties, agreed to review the clinic records for the purpose of determining whether they contained any exculpatory information.

Following an extended delay unrelated to the proceedings,[17] a hearing was held on May 8, 2002.[18] The court stated that it had reviewed the clinic records, which consisted of documents and an audiotape recording. The audio recording was a narrative detailing the assault that the victim had made for therapeutic purposes. The court concluded that the clinic records, and the audiotape in particular, were "extremely inculpating." The court then concluded that the clinic records did not meet the legal definition of exculpatory material so as to constitute a *Brady* violation.

"In *Brady* v. *Maryland*, supra, 373 U.S. 87, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. In order to prove a violation of the state's obligation to disclose exculpatory evidence under *Brady*, the defendant bears a heavy burden to establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was mate-

---

[17] The trial judge suffered a fractured hip on November 30, 2001.

[18] At the May 8, 2002 hearing, the defendant filed a supplemental motion for a new trial on the ground that an individual had been "coaching" the victim during her testimony. The court denied the supplemental motion.

rial." (Internal quotation marks omitted.) *State* v. *Peters-Hamlin*, 84 Conn. App. 211, 219, 852 A.2d 857 (2004); see also *State* v. *McIntyre*, 242 Conn. 318, 323, 699 A.2d 911 (1997).

As we discussed in part I, because the prosecutor had obtained and reviewed the clinic records, it was unnecessary for the court to conduct an in camera review; the records simply should have been turned over to the defendant. Nevertheless, after a careful review of the clinic records, we conclude that although the records contain some exculpatory evidence, they do not contain any exculpatory evidence that is material under *Brady*.

To be sure, "[i]t is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." (Internal quotation marks omitted.) *State* v. *Henderson*, 83 Conn. App. 739, 744, 853 A.2d 115, cert. denied, 271 Conn. 913, 859 A.2d 572 (2004). The prosecutor conceded to the court that the clinic records contained information that could have been used to impeach the victim's credibility. We must, therefore, determine whether the information contained in the clinic records was material.

"The test for materiality is well established. The United States Supreme Court . . . in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), [held] that undisclosed exculpatory evidence is material, *and that constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.* The United States Supreme Court recently discussed several aspects of materiality under *Bagley* that bear

emphasis. See *Kyles* v. *Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). The court explained that a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, *but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.* . . . The United States Supreme Court also emphasized that the *Bagley* test is not a sufficiency of evidence test. . . . A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. . . . Accordingly, the focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether nondisclosure of the evidence was so unfair as to undermine our confidence in the jury's verdict. *United States* v. *Bagley*, supra, 682." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 453–54, 758 A.2d 824 (2000). Simply put, "[w]here there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under *Brady*." (Internal quotation marks omitted.) *State* v. *Burke*, 51 Conn. App. 328, 333, 723 A.2d 327 (1998), cert. denied, 248 Conn. App. 901, 732 A.2d 177 (1999).

Our review of both the documents and the audio recording from the clinic reveals nothing to undermine our confidence in the jury's verdict so as call into question the overall fairness of the trial. Although some statements contained in the clinic records were inconsistent with some of the victim's other pretrial statements to therapists and the police, such inconsistencies merely were cumulative in light of defense counsel's extensive and thorough cross-examination of the victim.[19] That cumulative evidence is insufficient to render the notes material according to the *Brady* and *Bagley* standards. See *State* v. *Wilcox*, supra, 254 Conn. 455. We further agree with the court's conclusion that most of the evidence contained in the clinic's records was "extremely inculpating." We cannot conclude that the disclosure of the clinic records would have affected the outcome of the defendant's trial. Accordingly, there is no constitutional violation under *Brady*, and the defendant's claim fails.

IV

The defendant's final claim is that he was denied due process of law as a result of prosecutorial misconduct. Specifically, the defendant argues that four instances of prosecutorial misconduct deprived him of his constitutional rights.[20] We conclude that even if the prosecu-

[19] We also note that "[e]vidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." (Internal quotation marks omitted.) *State* v. *Shannon*, 212 Conn. 387, 400, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989). Moreover, "not every inconsistency is exculpatory and therefore its nondisclosure does not constitute a *Brady* violation." *State* v. *Gradzik*, 193 Conn. 35, 42, 475 A.2d 269 (1984).

[20] The defendant specifically argues that his right to a fair trial "pursuant to the 14th Amendment to the United States constitution and Article First, § 8 of the Connecticut constitution" was violated. The defendant has not briefed the state constitutional issue separately and, therefore, we will confine our analysis to the federal constitution. See footnote 11; see also *State*

tor's remarks were improper, the defendant was not deprived of a fair trial.

At the outset, we note that the defendant concedes that the instances of alleged misconduct were not preserved for our review and therefore seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. "Our Supreme Court, however, recently held that it is not necessary for a defendant to seek to prevail under the specific requirements of *Golding* in these circumstances. *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). The court explained that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial . . . . Instead of *Golding* analysis, the court explained, the determination must involve application of the specific prosecutorial misconduct factors articulated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), regardless of whether the defendant objected to the incidents of misconduct at trial. *State* v. *Stevenson*, supra, 573." (Citation omitted; internal quotation marks omitted.) *State* v. *Holliday*, 85 Conn. App. 242, 258, 856 A.2d 1041, cert. denied, 271 Conn. 945, 861 A.2d 1178 (2004). Nevertheless, both our Supreme Court and this court have also emphasized that "the responsibility of defense counsel, at the very least, [is] to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Accordingly, we emphasize that counsel's failure to object at trial, while not by itself *fatal* to a defendant's claim, frequently will indicate on appellate review that the

v. *Tate*, 85 Conn. App. 365, 368 n.2, 857 A.2d 394, cert. denied, 272 Conn. 901, 863 A.2d 696 (2004).

challenged comments do not rise to the magnitude of constitutional error . . . . Put differently . . . prosecutorial misconduct claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, *to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Crocker*, 83 Conn. App. 615, 659, 852 A.2d 762, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004); see also *State* v. *Stevenson*, supra, 576.

As a preliminary matter, we set forth certain relevant legal principles that guide our resolution of this issue. Our Supreme Court has advised that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor." (Internal quotation marks omitted.) *State* v. *Sinvil*, 270 Conn. 516, 524, 853 A.2d 105 (2004). "In analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial, an inquiry that in the present case necessarily will require evaluation of the defendant's other misconduct claims." (Internal quotation marks omitted.) *State* v. *Jarrett*, 82 Conn. App. 489, 501–502, 845 A.2d 476, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004). We also note that in order to prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice by establishing that "the trial as a whole was fundamentally unfair and that the

misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 807, 835 A.2d 977 (2003).

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [ The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *Waden*, 84 Conn. App. 147, 158, 852 A.2d 817, cert. denied, 271 Conn. 916, 859 A.2d 574 (2004).

Because most of the claimed prosecutorial misconduct occurred during closing argument, we set forth the legal principles applicable to such claims. "[P]rosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such misconduct has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of

counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . .

"Or to put it another way while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . . . A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows. . . . In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions . . . and those which are flagrant and therefore deny the accused a fair trial." (Internal quotation marks omitted.) *State* v. *Ancona*, 270 Conn. 568, 593–95, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005).

Last; we note that "[w]e do not scrutinize each individual comment in a vacuum, but rather we must review the comments complained of in the context of the entire trial. . . . It is in that context that the burden [falls] on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted." (Internal quotation marks omitted.) *State* v. *Holmes*, 64 Conn. App. 80,

90–91, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001). With the foregoing in mind, we now turn to the defendant's specific claims.

## A

We begin our analysis by determining whether the prosecutor engaged in misconduct. Only if we determine that misconduct occurred will we proceed to the question of whether the defendant was denied due process of law. The defendant has set forth four areas of alleged misconduct. We will address each in turn.

## 1

The defendant first claims that the prosecutor engaged in misconduct during her closing argument by vouching for the credibility of the state's witnesses and by appealing to the emotions of the jury. "The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 713, 793 A.2d 226 (2002).

The defendant first argues that the prosecutor made several comments that vilified him and his counsel and aroused sympathy for the victim. Specifically, he notes the following arguments: "[The victim] was not one of the lucky ones or one of the strong ones. She has had a very difficult time going on with her life after this

incident. . . . [She] had a very difficult time dealing with this. After twenty-one months of trying to put this behind her, of trying to overcome the fear and the anxiety that this event caused her, she has to walk into this courtroom, get up on the witness stand and go through it all over again. She has to endure more than three hours of exhaustive cross-examination, pointing out every minor inconsistency. . . . Do you really think that anybody after twenty-one months is going to remember exactly when they told exactly what to what person when there [have] been several people involved in this incident? I don't think anyone can do that . . . . Yes, there were some inconsistencies on what I would submit to you are relatively minor points . . . . What's more traumatic, having [the defendant] put his finger inside of her or having him put his penis inside of her? . . . Don't forget . . . this is a sixteen year old girl. This is not an adult woman we're talking about here. So, yes, there have been some memory gaps, there have been some inconsistencies. But defense counsel wants you to hold the victim to a standard of perfection that I submit to you no rape victim could ever meet, and certainly not one with post-traumatic stress disorder. . . . [The defendant] picked the right victim . . . someone who was not very assertive, someone who needed her friends to come over and try to intervene when he was harassing her because she couldn't—wasn't forceful enough to deal with it herself or get him to stop . . . . She paid a very heavy price for her naivete . . . ."

Our Supreme Court has cautioned that "[a]n appeal to emotions, passions, or prejudices improperly diverts the jury's attention away from the facts and makes it more difficult for it to decide the case on the evidence in the record. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but

on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Citations omitted; internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 307, 755 A.2d 868 (2000).

The prosecutor's comments were made in response to defense counsel's forceful closing argument during which the victim's credibility was strenuously attacked, particularly with regard to the various inconsistencies in her statements. Additionally, the evidence before the jury clearly indicated that the victim had injuries that required extensive therapy and medication following the sexual assault. The prosecutor's comments, therefore, consisted of proper commentary on the evidence and, when read in context, did not result in an improper appeal to the jury's emotions. See *State* v. *Crocker*, supra, 83 Conn. App. 666.

The defendant next argues that certain comments by the prosecutor during rebuttal argument resulted in improper vouching. Specifically, the defendant contends that the comments regarding the victim's inconsistencies resulted in the prosecutor's indirectly vouching for the credibility of the victim. We disagree. We note that "[p]rosecutors may not offer their opinions by vouching for the credibility or truthfulness of a witness. . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Benjamin*, 86 Conn. App. 344, 358, 861 A.2d 524 (2004). In the present case, however, the prosecutor's comments were in response to the defendant's attempts during the course of the trial to impeach the victim's credibility and did not constitute improper vouching. See id.

The prosecutor, however, did directly and improperly vouch for the victim's credibility during rebuttal argument. She stated to the jury: "Is it surprising that [the victim] might not remember what caused the blackout at the point in time when she gave her statement? And

she still does not remember how she got from a vertical position to a horizontal one. She didn't try to fill that gap. She didn't try to make up something. And how easy would it have been to say, 'Well, yeah. He grabbed me and pulled me to the floor?' She still does not remember that. *And she was honest with you about that.* She told you she did not remember how she got on the floor." (Emphasis added.)

Of course, a prosecutor "is not permitted to vouch personally for the truth or veracity of the state's witnesses." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 454, 797 A.2d 1088 (2002). "[I]t is well established that the evaluation of [witnesses'] testimony and credibility are wholly within the province of the trier of fact. . . . The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Spencer*, 81 Conn. App. 320, 327, 840 A.2d 7, cert. granted on other grounds, 269 Conn. 907, 852 A.2d 738 (2004). We believe that under these facts and circumstances, the comment was improper.

Finally, the defendant argues that the prosecutor committed misconduct by indirectly vouching for the credibility of the victim when the prosecutor suggested that her testimony must be true because she would not be able to deceive Puryear and Thomas, two experienced mental health professionals. Specifically, the defendant refers to the following argument made during closing argument: "This is not a made-up story, ladies and gentlemen. And do you really think [that] if it was a made-up story that somebody like Mr. Thomas, with twenty-five years of experience in adolescent psychiatric social work, would not have picked up on it? Do you really think that Dr. Puryear, who I submit to you is quite a sharp lady, very intelligent, teaches at this medical school, do you think she would not have caught

this? This is a sixteen year old girl telling them what happened. They are trained professionals. This is not a fifty year old person who may have life experiences that might allow them to make up a story like this. This is a sixteen year old girl. Do you really think that someone with twenty-five years experience working with adolescents would not have picked up on that? And there is nothing from what she told either psychiatrist that is at all inconsistent with who did this to her, the fact that it happened, when it happened and where it happened."

The state concedes that this was an improper argument. The state, however, argues that this isolated comment did not deprive the defendant of his right to a fair trial.

2

The defendant next claims that the prosecutor committed misconduct by directing the jury to speculate on facts that were not in evidence. Specifically, the defendant argues that it was improper for the prosecutor to ask the jury to speculate about the defendant's mental state and about the meaning of a letter that had been mentioned during Puryear's testimony, but that was not admitted into evidence. We are not persuaded.

The following additional facts are necessary for our resolution of the defendant's claim. Puryear testified that she had read a letter from Stuart C. Yudofsky, a psychiatrist who had treated the victim in late December, 1999.[21] Neither party called Yudofsky as a witness. According to this letter, the victim indicated that the defendant had abused her physically, sexually and psychologically for a period of three hours after taking her

---

[21] Yudofsky diagnosed the victim with post-traumatic stress disorder, and ordered both therapy and medication. Puryear testified on cross-examination that she had read this letter but did not rely on Yudofsky's diagnosis. She also stated that she did not review Yudofsky's file.

downstairs. During the course of the trial, the defense strategy consisted in part of using this information to demonstrate that the defendant could not have assaulted the victim for such a long period of time.

During closing argument, defense counsel specifically referred to the Yudofsky letter and the three hour time frame. He also pointed out how many people were in the dining hall and the time frame of when people left. The thrust of this argument to the jury was that the defendant could not have abused the victim for a period of three hours after she went downstairs with him.

In rebuttal argument, the prosecutor responded to the defendant's arguments concerning the Yudofsky letter: "And [defense counsel] makes a big to-do about the three hours that Dr. Yudofsky reports that [the victim] was psychologically and sexually abused. Well, we don't know if Dr. Yudofsky was talking about her entire shift that night in the cafeteria from the time she arrived till the time she got back to her dorm room. Obviously, many people would consider the questions and the manner in which the defendant was speaking to her as sexual or psychological harassment. So, for all we know, he may be referring to that entire period of time from 5:30 until whenever she got back to her dorm room. We don't know that. We don't know if that was an error in his report. Dr. Yudofsky did not testify. So, we don't know that. And defense counsel is encouraging you to speculate. That is not what your job as jurors is."

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. See *State* v. *Copas*, 252 Conn. 318, 336–39, 746 A.2d 761 (2000) (jury's inferences from evidence must be reasonable and founded upon evidence and cannot be based on mere conjecture); *State* v. *Pouncey*, 241 Conn.

802, 811, 699 A.2d 901 (1997) (counsel may not suggest inference from facts not in evidence). . . . The rationale for the rule prohibiting the state from making such a reference is to avoid giving the jury the impression that the state has private information, not introduced into evidence, bearing on the case." (Citation omitted; internal quotation marks omitted.) *State* v. *Fields*, 265 Conn. 184, 208, 827 A.2d 690 (2003).

Because the defendant raised the issue of the Yudofsky letter in his closing argument, the prosecutor was free to respond to the inferences drawn by defense counsel. "[T]he state may . . . properly respond to inferences raised by the defendant's closing argument." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 717. We believe that under these circumstances, the prosecutor, by asking the jury to draw a reasonable inference regarding the letter, did not cross the line demarcating improper comment and move into the improper area of sheer speculation unconnected to the evidence. See *State* v. *Richardson*, 86 Conn. App. 32, 40–42, 860 A.2d 272 (2004), cert. denied, 273 Conn. 907, 868 A.2d 748 (2005). The letter was not formally introduced into evidence, nor was Yudofsky called as a witness to explain what the letter meant. Essentially, we are convinced that both parties properly invited the jury to draw a reasonable inference as to the content and meaning of the Yudofsky letter, the meaning of which was ambiguous. Accordingly, we cannot conclude that this constituted prosecutorial misconduct.

The defendant also claims that it was improper for the prosecutor to ask the jury to speculate about his mental state. He specifically objects to the following statement: "Now, with regard to the location where this occurred, since [defense] counsel has emphasized to you what a high traffic area this was where the rape occurred. Well, ladies and gentlemen, rape is a crime

*of opportunity. And it is a high risk activity. In fact, for some rapists that's part of the thrill. Getting away with it right under everyone's nose. But I submit to you that this was a calculated risk that the defendant took in this case. He knew everyone's schedule in the kitchen. He had been working there for over a month. He was the one in charge of seeing to it that the pots in the basement were done. So, he had been down there before enough times to know when there was no traffic coming through this area."*

There was evidence before the jury that the defendant had supervised the students working in the dining hall for several weeks. It is a logical inference that he would have known both the routine and the schedule of the students and employees in that area. We cannot agree with the defendant that all of these comments made during rebuttal argument constituted misconduct. See *State* v. *Singh*, supra, 259 Conn. 717 n.22. "In deciding cases . . . [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *Rolli*, 53 Conn. App. 269, 281, 729 A.2d 245, cert. denied, 249 Conn. 926, 733 A.2d 850 (1999). Such statements did not constitute misconduct.

The prosecutor did, however, commit misconduct by describing rape as often being a "crime of opportunity" that is committed for "the thrill" of it. The jury did not hear any evidence regarding these matters. The prosecutor also argued that the defendant had the opportunity to prepare and to plan his assault on the basis of his knowledge of the activities in the dining hall. Such general comments regarding rapists were neither based on the evidence nor were they within the

common knowledge of the jury. Cf. *State* v. *Bothwell*, 78 Conn. App. 64, 73, 826 A.2d 182 (common knowledge that drunken drivers present danger to other drivers), cert. denied, 266 Conn. 908, 832 A.2d 72 (2003); *State* v. *Rolli*, supra, 53 Conn. App. 280–82 (common knowledge regarding driving time on Interstate 95).

"A prosecutor . . . may not . . . inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Blackwell*, 86 Conn. App. 409, 422, 861 A.2d 548 (2004), cert. denied, 272 Conn. 922, 867 A.2d 838 (2005). We believe, therefore, that such comments constituted misconduct because they included information that was not contained within the evidence in the case and that was beyond the common knowledge of the jurors.

3

The defendant next claims that the prosecutor committed misconduct by denigrating the role of defense counsel during rebuttal argument and by discrediting T, a witness for the defense. We are not persuaded.

The following additional facts are necessary for our discussion. T, a student at the boarding school, testified that the victim was "pale" and "bigger" than most of her classmates, who tended to be very slender and pretty. She also testified that the victim did not have many friends at the school, was lonely and missed her family and friends. T and the victim had a discussion regarding the sexual assault in November, 1999. According to T, the victim stated that she performed oral sex on the defendant and was not upset. T then asked if she could borrow a shirt from the victim and then left.

During closing argument, defense counsel made specific reference to T's testimony: "Now, this is an individ-

ual [who] is larger than the defendant, as we know from the testimony of [T] . . . . But we also know from [T] that [the victim] told [T], who she did not know very well, that she had gone to her place to borrow a shirt, and she tells [T] about oral sex, that she performed oral sex on [the defendant]. . . . [T's] response was, or . . . her reaction was [that] it didn't seem serious, so she didn't go to the police." Defense counsel then referred to T's comments regarding the victim's appearance, and her lack of friends and feelings of loneliness and being homesick.

In response to the defendant's argument, the prosecutor noted that T appeared to be interested in borrowing a shirt from the victim and not concerned about her well-being. The prosecutor then twice referred to T as "Miss Sensitive." She continued by stating: "I hope I don't have friends like that. Do you think her interest went beyond getting a shirt from this pale and needy girl . . . . Well, she wasn't too needy for [T] to fit into her shirt. And defense counsel could not resist a little victim bashing through [T] when [T] was [testifying], you know, talking about her being unpopular and not having many friends and not fitting in very well. Well, she's a member of the volleyball team. She was a good member of the volleyball team, according to the coach. She had her best friend [D] at the school, who went with her to give her statement. This is just, this is just red herrings that the defense counsel is throwing out at you . . . ."

The prosecutor then challenged the defense theory that the victim fabricated the assault in order to be able to return home. She pointed out to the jury that the victim returned to the boarding school to start the next term. "That just does—the defense theory on that does not make sense, ladies and gentlemen. That's a really stupid way to do it, if that's what your purpose is: to get out of coming back to school." Finally, in reference

to defense counsel's question of Puryear regarding false memory syndrome,[22] the prosecutor stated: "And this baloney about these false memories that [defense counsel] talked about with Dr. Puryear, she did not endorse that theory at all. That was the defense counsel saying that. She did not endorse that theory whatsoever."

"It is improper for a prosecutor to denigrate the function of defense counsel. . . . [T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . It does not follow [however] that every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . . [W]e are convinced that reasonable jurors are able to differentiate between lawyers' ripostes and actual evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Holliday*, supra, 85 Conn. App. 263.

We have reviewed the entire transcript of the closing argument and are not persuaded that the prosecutor struck a foul blow. Her comments were proper in light of the evidence and defense counsel's comments during closing argument. First, we are convinced that the prosecutor's comments regarding T were proper when compared with T's testimony and the comments made during defense counsel's closing argument. Although we note the prosecutor's use of sarcasm, we do not believe that it was used in the excessive and repetitive manner that our Supreme Court cautioned against in *State* v. *Rizzo*, 266 Conn. 171, 261–64, 833 A.2d 363

---

[22] During closing argument, defense counsel stated that Puryear had agreed with the theory of false memory or pseudomemory and that there was debate regarding repressed sexual assaults. The prosecutor objected to that as a mischaracterization of Puryear's testimony, and the court agreed that such a statement did not comport with Puryear's testimony. Defense counsel argued that he recalled such testimony, but that the jury was free to review that portion of the testimony.

(2003). Finally, although the prosecutor's description of the defense theory as "stupid" or the use of the term "baloney" may have been inartful, we are satisfied that the use of these rhetorical devices fell within the scope of fair argument. See *State* v. *Tate*, 85 Conn. App. 365, 376, 857 A.2d 394, cert. denied, 272 Conn. 901, 863 A.2d 696 (2004).

4

The defendant's final claim of prosecutorial misconduct stems not from closing argument, but from the testimony of the state's rebuttal witness, the father of the victim. Specifically, the defendant argues that the prosecutor improperly elicited testimony from the victim's father that she knew could have been impeached by information contained in the unredacted notes of Thomas. He further contends that the prosecutor's failure to turn over the clinic records was not only a *Brady* violation, but prosecutorial misconduct as well.

We quickly may dispose of the defendant's latter claim. In part III, we determined that although the prosecutor should have turned the clinic records over to the defendant, the failure to do so was not material and, therefore, not a *Brady* violation. Accordingly, even if we were to determine that the prosecutor committed misconduct by failing to disclose the clinic records to the defendant, we already have concluded that this was not a *Brady* violation. It follows, therefore, that the defendant's right to a fair trial was not implicated and, thus, his claim of prosecutorial misconduct on this basis must fail.

With respect to the defendant's former claim, the following additional facts are necessary. The prosecutor called the victim's father as a rebuttal witness. He stated that he had hired a police officer to stay outside of his house for more than one year following the assault. He also testified that the victim had been fearful that the defendant would appear in her hometown.

On appeal, the defendant argues in his brief that he "is confident that there is information in [Thomas' unredacted notes], which the prosecutor was aware of but barred defense counsel from seeing, that offers an alternative reason for security at the house." We disagree.

The prosecutor called the victim's father to rebut the defense argument that the victim had returned to the school several years after the assault to attend the graduation of D. Defense counsel attempted to show that during that return, the victim appeared happy and untroubled at the school. Essentially, the defendant argued that if the victim had been sexually assaulted at the school, she could not have returned to the scene of the crime. The victim's father testified that to protect his daughter, he purposefully withheld information that the defendant had been released on bond. He stated that she was so insecure and frightened following the assault that he had to hire a police officer to help secure his home and to allay his daughter's fears. We are not persuaded by the defendant's attempt on appeal to argue that the implication of this testimony was to convince the jury that the defendant was so dangerous that he might travel to the victim's home and harm her. Moreover, even if we agreed with the defendant that Thomas' notes would have provided him with impeachment material with respect to the victim's father, we conclude that such a failure was not material within *Brady*.[23] In short, this claim of prosecutorial misconduct must fail.

## B

Having concluded that some of the prosecutor's comments[24] were improper, we now turn to the question of

---

[23] See part III.

[24] We note that even if we were to apply the *Williams* factors to the comments we have determined were proper, we would conclude that the defendant was not deprived of a fair trial. "[C]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line. . . . Therefore,

whether these comments "so infect[ed] the trial with unfairness as to make the conviction a denial of due process . . . . In doing so, we will consider the factors listed by our Supreme Court in *State* v. *Williams,* supra, 204 Conn. 540." (Citation omitted; internal quotation marks omitted.) *State* v. *Benjamin,* supra, 86 Conn. App. 360. In applying the *Williams* factors, we acknowledge that the defendant failed to object to any of the comments made by the prosecutor, and this must enter into our assessment of each factor. See id. These factors include: "(1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the misconduct; (3) the frequency of the misconduct; (4) the centrality of the misconduct to the critical issues in the case; (5) the strength of the curative measures adopted; and (6) the strength of the state's case." *State* v. *Holliday,* supra, 85 Conn. App. 259. We address each of the instances of misconduct in turn.

1

We have determined that it was improper for the prosecutor to vouch directly for the victim's credibility by arguing that the victim did not fabricate a story to explain how she came to be on the downstairs floor of the dining hall and that the victim was "honest with [the jury] about that." We conclude that these improper comments did not deprive the defendant of his right to a fair trial.

---

we must review the comments complained of in the context of the entire trial. . . . [T]he burden is on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Woods,* 250 Conn. 807, 816, 740 A.2d 371 (1999). We have reviewed the comments complained of in the context of the entire trial and are satisfied that these comments, individual and in toto, were not so egregious as to infringe on the defendant's right to a fair trial. See *State* v. *Duteau,* 68 Conn. App. 248, 260, 791 A.2d 591, cert. denied, 260 Conn. 939, 835 A.2d 58 (2002).

We note that the prosecutor made these comments in response to the defendant's withering attacks on the victim's credibility. Although it is not fatal to his claim, the defendant's counsel failed to object or to seek a curative instruction to these comments. In light of the facts and circumstances of this case, the misconduct was not severe. Although the prosecutor informed the jury that the victim was telling the truth, it was in a limited context, referring to the victim's testimony that she could not recall how she ended up on the floor during the assault. We also note that "[t]he state's case may not have been ironclad; however, we have never stated that the state's evidence must have been over-whelming in order to support a conclusion that prosecu-torial misconduct did not deprive the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Crocker*, supra, 83 Conn. App. 671. Last, despite the defendant's arguments to the contrary, there was no pattern of egregious misconduct; we have concluded that the prosecutor made only three improper state-ments during her closing and rebuttal arguments. In short, the defendant's right to a fair trial was not violated by these comments.

2

The state concedes that it was improper for the prose-cutor to argue to the jury that the victim's testimony must be true because she would not be able to deceive Puryear and Thomas, two experienced mental health professionals. The defendant classified this as improper vouching for the credibility of the victim.[25] Applying the

[25] The state, in its brief, qualified its concession of misconduct. "The state concedes that this is an improper argument, although not necessarily because it constitutes improper vouching by the prosecutor. . . . If, as in [*State* v. *Toccaline*, supra, 258 Conn. 542], the prosecutor could not directly question an expert witness as to her opinion regarding the credibility of the victim, the state assumes it is also improper for the prosecutor to suggest during argument, as here, that the experts implicitly credited the complain-ant's allegation."

*Williams* factors, we cannot say that this comment violated the defendant's right to a fair trial.

As we previously noted, no pattern of misconduct prevailed throughout the proceedings. Additionally, the defendant failed to object to the comments or to request any curative instructions. During the charge to the jury, the court emphasized that it was the jury's role to assess the credibility of the witnesses and to weigh the evidence, including that from expert witnesses, and that the jury should avoid basing its conclusions on sympathy or personal likes or dislikes. Simply put, we agree with the state that the comments with respect to Puryear and Thomas, although improper, did not deprive the defendant of his due process right to a fair trial.

3

The final area of misconduct concerns the prosecutors' description of rape as a "crime of opportunity" and the argument that rapists commit that crime for "the thrill" of it. These isolated comments regarding the mental state of some rapists served as background material for the prosecutor's argument that this defendant, with his knowledge of the schedules of the students and employees, and knowledge of the operation of the dining hall, was in fact able to commit the crime. The comments were made in response to defense counsel's argument that such a crime could not have been committed in the dining hall. They were not objected to, nor was a curative instruction requested. Finally, these broad statements were not severe when considered in the context of the entire proceeding. In short, the comments did not deprive the defendant of his right to a fair trial.

C

The defendant's final claim is that we should reverse his conviction under our inherent supervisory powers.

See *State* v. *Payne*, supra, 260 Conn. 450–53 (appellate courts have power to reverse defendant's conviction under supervisory powers in interest of justice even when prosecutorial misconduct does not deprive defendant of fair trial). We decline the defendant's invitation. The three isolated instances of misconduct do not warrant the drastic remedy of invoking our supervisory powers.

The judgment is affirmed.

In this opinion the other judges concurred.