STATE OF CONNECTICUT *v.* KENNARD WADEN
(AC 23292)

Lavery, C. J., and Bishop and Dupont, Js.

---

148

Argued January 14—officially released July 27, 2004

*Melanie C. Frank*, assistant public defender, with whom, on the brief, was *Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Russell C. Zentner*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Christopher Pelosi*, assistant state's attorney, and *Timothy J. Sugrue*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Kennard Waden, appeals from the judgment of conviction, rendered after a jury trial, of sale of narcotics by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), possession of narcotics with intent to sell by a person who is not drug-dependent in violation General Statutes § 21a-278 (b), possession of a narcotic substance with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b), posses-

sion of narcotics in violation of General Statutes § 21a-279 (a) and possession of narcotics within 1500 feet of a school in violation of General Statutes § 21a-279 (d).[1] On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction and (2) he was deprived of a fair trial by prosecutorial misconduct. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 11:30 a.m., on January 3, 2002, Felix Ortiz and Nastor Carabello, detectives with the Hartford police department, received information from fellow detectives Ramon Baez and Patricia Beaudin that there were illegal narcotic sales occurring at 152-154 Brook Street in Hartford. To verify that information, Ortiz and Carabello proceeded to Brook Street to set up surveillance from approximately 100 yards away in an unmarked van. It was a clear day, and their view of the subject location was unobstructed.

The detectives observed a number of known drug-dependent individuals[2] approaching a black male, later identified as the defendant. Using binoculars, Carabello observed the defendant receive money in exchange for a small item. After making between one to four transactions, the defendant would cross the street and proceed to a parking lot where both detectives would lose sight of him until he returned to 152-154 Brook Street a few minutes later. During approximately thirty minutes to one hour of surveillance, the detectives observed ten to fifteen transactions.

Ortiz and Carabello decided to reposition themselves on Pliny Street in order to observe the defendant when

[1] The defendant's convictions of possession of narcotics and possession of narcotics within 1500 feet of a school were merged with his other convictions for purposes of sentencing.

[2] At trial, Carabello testified that he knew that the individuals were drug-dependent because he had spoken with them in the past.

he went to the parking lot area. They suspected that he kept his "stash" of narcotics there. Carabello exited their vehicle and positioned himself where he could have an unobstructed view of the defendant. He soon observed the defendant escort known drug-dependent individuals through the parking lot to a tree after initially meeting with them at 152-154 Brook Street. Those individuals gave the defendant money in exchange for a small item. Carabello also observed the defendant retrieve a bag from the ground next to the tree. Carbello remained at his surveillance location, which was forty to fifty yards from the tree, for approximately twenty to thirty minutes, during which time he observed three or four transactions.

Believing that he had discovered the defendant's "stash" of drugs, Carabello returned to the vehicle. He and Ortiz then drove further along Pliny Street to meet with Baez and Beaudin to inform them of what they had observed and to coordinate the defendant's arrest. Soon thereafter, the four detectives returned to 152-154 Brook Street and arrested the defendant. Ortiz performed a patdown search on the defendant. Although the defendant did not have any narcotics on his person, he was carrying $534 in denominations of one, five, ten and twenty dollar bills.

Carabello and Baez searched the area around the tree where Carabello had observed the defendant retrieve a bag while he made the suspected drug transactions. On the ground next to the tree, Carabello found a plastic sandwich bag that contained thirty-two small, knotted plastic bags. The smaller bags contained a white powder, which subsequently tested positive for cocaine. The drug transactions and the seizure of the narcotics all occurred within 1500 feet of a school. The defendant was not enrolled as a student in that school on January 3, 2002.

On March 21, 2002, following a jury trial, the defendant was convicted of all charges and sentenced to a total effective term of twenty-three years imprisonment, execution suspended after eight years, and five years probation. This appeal followed. Additional facts will be provided as necessary.

I

The defendant claims that the evidence adduced at trial was insufficient to support his conviction. Specifically, he claims that there was insufficient evidence to prove beyond a reasonable doubt that (1) he possessed narcotics and (2) he sold narcotics. We disagree.[3]

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the [finding of guilt]. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of

[3] The defendant concedes that he failed to preserve his claim at trial and, therefore, seeks review pursuant to State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Unpreserved sufficiency claims are reviewable on appeal because such claims implicate a defendant's federal constitutional right not to be convicted of a crime upon insufficient proof. . . . Our Supreme Court . . . has held that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of Golding. Accordingly, we conclude that no practical reason exists to engage in a Golding analysis of a sufficiency of the evidence claim and, thus, review the challenge as we do any other properly preserved claim." (Citations omitted; internal quotation marks omitted.) State v. Ward, 76 Conn. App. 779, 795 n.8, 821 A.2d 822, cert. denied, 264 Conn. 918, 826 A.2d 1160 (2003).

facts which establishes guilt in a case involving substantial circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Griffin*, 78 Conn. App. 646, 649–50, 828 A.2d 651 (2003).

"[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility." (Citation omitted; internal quotation marks omitted.) *State* v. *Alford*, 37 Conn. App. 180, 184, 655 A.2d 782, cert. denied, 234 Conn. 914, 660 A.2d 357 (1995).

A

The defendant first claims that there was insufficient evidence to prove beyond a reasonable doubt that he possessed narcotics. Specifically, the defendant argues that the state did not prove that he knew of the character of the narcotic substance or that he exercised dominion or control over it.

"[T]o prove possession of a narcotic substance, the state must establish beyond a reasonable doubt that the accused knew of the character of the drug and its presence and exercised dominion and control over it. . . . Where, as in the present case, the contraband is not found on the defendant's person, the state must proceed on the alternate theory of constructive posses-

sion, that is, possession without direct physical contact. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) *State* v. *Jefferson*, 67 Conn. App. 249, 256–57, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002).

In the present case, the state presented sufficient evidence to support the inference that the defendant knew of the character of the cocaine and that he exercised dominion and control over it. During their surveillance of 152-154 Brook Street, an area known for narcotics trafficking, Ortiz and Carabello observed what, on the basis of their training and experience, they believed to be narcotic sales. Drug-dependent individuals would approach the defendant and exchange money for a small item. After making between one to four transactions, the defendant would cross the street, and proceed to a parking lot and then return to 152-154 Brook Street a few minutes later. Ortiz and Carabello observed ten to fifteen transactions in thirty minutes to one hour of surveillance.

After Ortiz and Carabello repositioned themselves, Carabello observed the defendant escort drug-dependent individuals through the parking lot to a tree, where they would give the defendant money in exchange for a small item. During the transactions, the defendant would retrieve a bag from the ground next to the tree. Carabello observed three or four of these transactions in twenty to thirty minutes of surveillance. When Carabello searched the ground near the tree where he had observed the defendant retrieve the bag, he found a plastic sandwich bag that contained thirty-two small, knotted plastic bags of cocaine. At trial, the state pre-

sented expert testimony that it is common for a street level drug dealer to keep a "stash" of narcotics in an area close to where he is selling, rather than have a significant quantity on his person.[4]

On the basis of the cumulative effect of that evidence and the reasonable inferences drawn therefrom, we conclude that the jury reasonably could have found that the defendant was in constructive possession of the narcotics that were seized from near the tree.

## B

The defendant next claims that there was insufficient evidence to prove beyond a reasonable doubt that he sold narcotics. Specifically, he argues that the state failed to prove that the small items that he sold were in fact narcotics. We disagree.

"To prove sale of a narcotic substance, [t]he state [must] prove . . . [beyond a reasonable doubt] that the defendant knowingly sold the substance to another person and that the substance sold was a narcotic." (Internal quotation marks omitted.) *State* v. *Gayle*, 64 Conn. App. 596, 601, 781 A.2d 383, cert. denied, 258 Conn. 920, 782 A.2d 1248 (2001). On the basis of our analysis in the preceding section and for the following additional reasons, we conclude that the state pre-

___

[4] On direct examination of Beaudin, an expert witness for the prosecution, the following colloquy occurred:

"[The Prosecutor]: And is it uncommon for individuals, who sell cocaine on the street level, to not have the narcotics on [their] person?

"[The Witness]: No. That is common for them not to have any on their person, in case we stop them.

"[The Prosecutor]: Can you elaborate a little further?

"[The Witness]: What they do most of the time is, they will have, maybe, one or two bags on them. So, if they get stopped by the police, they could easily either swallow it or try to just drop it on the ground or do something like that to try to mislead us.

"They usually put it in what we call a stash spot. They have usually a stash spot for larger amounts. They will go to it, and then they will take one or two bags at a time. And they will go back as they need to."

sented sufficient evidence to support the inference that the defendant sold cocaine.

The defendant constructively possessed the bag that was seized near the tree containing thirty-two small, knotted plastic bags of cocaine. At trial, Beaudin, an expert witness, testified that the quantity of cocaine that the defendant possessed and the manner in which it was packaged is consistent with street level narcotics sales.[5] In addition, Carabello observed the defendant escort drug-dependent individuals through the parking lot to that same tree, where they would give the defendant money in exchange for a small item. During those transactions, the defendant would retrieve a bag from the ground next to the tree. When the defendant was arrested, he was carrying $534 in denominations of one,

---

[5] On direct examination of Beaudin, the following colloquy, in relevant part, occurred:

"[The Prosecutor]: Detective Beaudin, through your training and experience, have you learned about how drugs are possessed for persons using versus possession with intent to sell them?

"[The Witness]: Yes. Usually, they are packaged differently. If the person is just buying drugs, they have a very small amount. If they're selling, they will have a larger amount.

"[The Prosecutor]: Based on your training and experience, have you learned how powder cocaine is packaged and sold for personal use?

"[The Witness]: Normally, in Hartford, what they do is, they put—they take a baggie. They put a small amount of cocaine, like, in the corner of the baggie. Then they twist it up. They tie it off. . . .

* * *

"[The Prosecutor]: How is cocaine usually packaged for street distribution?

"[The Witness]: If you are going to get it for street distribution, you are going to get, like, a regular size baggie with—I don't know up to 100 small baggies inside of that.

"[The Prosecutor]: Do you believe there is—in your opinion—is there a difference between the amount of cocaine a person possesses for his personal use or—versus an amount a person uses versus the amount of a sale?

"[The Witness]: Yes.

"[The Prosecutor]: Can you give us an example?

"[The Witness]: To possess, you have to, like, maybe have one to three bags, something like that. And to sell, you will have ten to thirty bags or forty or whatever."

five, ten and twenty dollar bills. Beaudin testified that drug dealers typically have large amounts of money in small denominations on their person.[6] Beaudin also testified that the scenario in the present case is consistent with drug sales.[7]

"[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence . . . ." (Internal quotation marks omitted.) *State* v. *Forde*, 52 Conn. App. 159, 167, 726 A.2d 132, cert. denied, 248 Conn. 918, 734 A.2d 567 (1999). On the basis of the cumulative effect of the evidence and the reasonable inferences drawn therefrom, we conclude that the jury reasonably could have found that the defendant had sold narcotics.

## II

The defendant also claims that certain remarks made by the prosecutor during closing argument to the jury

[6] On direct examination of Beaudin, the following colloquy, in relevant part, occurred:

"[The Prosecutor]: Is it common for, say, a seller of cocaine to have a large amount of money on them?

"[The Witness]: Yes.

\* \* \*

"[The Prosecutor]: Is there a big denomination of bills?

"[The Witness]: It usually, since the bags are usually $10 to $20 . . . bags, they usually see a lot of twenties, tens or fives—all small denominations."

[7] On direct examination of Beaudin, the following colloquy occurred:

"[The Prosecutor]: I will ask you a hypothetical question. If a person possessed powder cocaine in a large plastic bag, which contained, say, a number of smaller plastic bags containing cocaine, and while conducting surveillance of the person, he was observed making hand to hand transactions with the passersby, and somebody saw these exchanged for items with this person, could you—based on your training and experience—feel that possession of that item was consistent with a sale of narcotics?

"[The Witness]: Yes.

"[The Prosecutor]: Now, if I were to tell you that a person, say, had [$400] to $500, which was found on his person, what if anything would be your opinion?

deprived the defendant of a fair trial. Specifically, he claims that the prosecutor improperly vouched for the credibility of the police officers who testified for the state,[8] lowered the state's burden of proof,[9] and referred to facts that were not in evidence and appealed to the emotions of the jurors.[10]

Although the defendant concedes that he failed to preserve his claim for appeal, he seeks review of his claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) or, alternatively, our inherent supervisory authority over the administration of justice.

Initially, we note that in *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004), our Supreme Court "determined that the *Golding* test is superfluous in prosecutorial misconduct cases because the due process analysis employed in prosecutorial misconduct cases, pursuant to *State* v. *Williams*, 204 Conn. 523, 539–40, 529 A.2d 653 (1987), embodies the third and fourth prongs of *Golding*, i.e., whether a constitutional violation occurred and whether it was harmful." *State* v. *Santiago*, 269 Conn. 726, 732, 850 A.2d 199 (2004). We therefore will not apply the *Golding* test to the defendant's claims of prosecutorial misconduct, as the due process analysis set forth in *Williams* adequately will address whether unpreserved claims are of constitu-

"[The Witness]: That would be consistent with the scenario that they were receiving money for drugs."

[8] In that regard, the gravamen of the defendant's claim is that during closing argument, the prosecutor stressed the officers' qualifications, experience and method of operation rather than the facts of the case.

[9] The defendant challenges the following portion of the prosecutor's closing argument: "And there were no fingerprints. It is not the, you know, the case of the century here. . . . Why fingerprint anyway? . . . Again, this is a drug case. It is not what I would call a major investigation of a murder or some kind of bloody robbery. It is a narcotics case."

[10] The defendant challenges the following portion of the prosecutor's closing argument: "I don't think there is any buyer who is going to mess with a . . . drug dealer and try to take a stash. Most of the time, drug buyers are pathetic individuals. Drug sellers can be intimidating."

tional magnitude and may require a new trial. See id., 733.

Before addressing the merits of the defendant's claims, we set forth the general principles that guide our review of prosecutorial misconduct claims. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. . . .

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two

steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question . . . .

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 571–73.

On the basis of our review of the record and trial transcript, we conclude that none of the individual statements made by the prosecutor during closing argument were improper[11] and, therefore, the defendant has failed to establish that the prosecutor's conduct constituted misconduct. As such, we do not need to consider the second stage of our progression for analyzing claims of prosecutorial misconduct, that is, whether the combined instances of misconduct deprived the defendant of a fair trial.[12]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[11] See footnotes 8, 9 and 10.

[12] We also decline to exercise our supervisory authority over the administration of justice because the defendant has not demonstrated and the record does not disclose any misconduct by the prosecutor.