******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v*. ANTHONY MARTINEZ
(SC 19198)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa,
Robinson and Vertefeuille, Js.

*Argued April 23—officially released December 1, 2015*

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *John Smriga*, state's attorney, and *Nicholas Bove*, senior assistant state's attorney, for the appellant (state).

*Alice Osedach*, assistant public defender, for the appellee (defendant).

*Opinion*

ZARELLA, J. The principal issue in this certified appeal is whether the Appellate Court properly reversed the judgment of the trial court on the ground that the senior assistant state's attorney (prosecutor) made certain improper comments during closing argument that deprived the defendant, Anthony Martinez, of a fair trial. Following his conviction of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a) and conspiracy to possess narcotics with intent to sell in violation of § 21a-277 (a) and General Statutes § 53a-48 (a), the defendant appealed to the Appellate Court, which reversed the judgment of conviction and ordered a new trial. *State* v. *Martinez*, 143 Conn. App. 541, 543, 581, 69 A.3d 975 (2013). On appeal to this court, the state challenges the Appellate Court's conclusion that the prosecutor violated a court order when he stated during closing argument that no money from an alleged drug transaction was found on the defendant's person and referred to facts outside the record regarding the custom and practice of narcotics dealers when he argued that it would be "logical" and "[make] sense" for the defendant to ensure that any drugs or money involved in the transaction was held by his coconspirator. The defendant contends that the Appellate Court properly concluded that the state had violated a court order concerning the permissible boundaries of argument, made factual assertions to the jury he knew were untrue and compounded these improprieties by arguing facts unsupported by the evidence regarding the modus operandi of drug dealers, thus depriving the defendant of his due process right to a fair trial. We conclude that the prosecutor's argument was not entirely proper, but we do not agree with the defendant that the improper argument rendered the trial fundamentally unfair. Accordingly, we reverse the judgment of the Appellate Court.

I

We begin with the following relevant facts set forth in the Appellate Court's opinion. "On June 2, 2009, Lieutenant Christopher LaMaine, of the Bridgeport [P]olice [D]epartment, was conducting an investigation into suspected drug activity at a particular residence in [the city of] Bridgeport. While conducting surveillance of the residence, LaMaine observed two individuals, later identified as Javier Nevarez and Camilla Blakes, approach the residence in what he concluded was an attempt to purchase narcotics. Nevarez and Blakes left the residence without engaging in a drug transaction and, instead, drove their car to Washington Park in Bridgeport, an area known for drug activity. LaMaine followed Nevarez and Blakes and parked his surveillance van on the edge of the park. From the backseat of the van, through tinted windows, LaMaine watched Nevarez and Blakes approach a male who directed them

to a bench farther into the park. The defendant and [Mari] Vargas were sitting on that park bench with their backs toward LaMaine.

"Eighty-two yards away from the bench where the defendant and Vargas were sitting, LaMaine used binoculars to view the scene. . . . [T]he defendant and Vargas sat next to each other, almost shoulder to shoulder, with the defendant on the right side of the bench and Vargas in the middle. Nevarez and Blakes approached the defendant, and Nevarez and the defendant appeared to speak briefly. The defendant and Vargas both then looked down at a common point in their laps. Although LaMaine could not see their hands, laps, or what they were looking at, from the way they both turned toward each other and down, LaMaine believed that the defendant and Vargas appeared to exchange something. The defendant then reached up to a point at which his hand was visible to LaMaine, and LaMaine observed him appear to exchange something with Nevarez. Nevarez and Blakes then turned and walked back toward their vehicle, and, as Nevarez walked, he inspected something in his hand, cupping it in one palm and poking it with his other finger, consistent, according to LaMaine, with an inspection of drugs.

"After Nevarez and Blakes left the bench, a second man approached the defendant and another apparent exchange took place between the defendant and Vargas, and then between the defendant and the second man, in the exact same manner that had occurred with Nevarez. The second man walked away and was never identified or apprehended. As Nevarez and Blakes got back into their car, LaMaine radioed nearby officers to stop the car to check for narcotics. As the officers were approaching, Nevarez and Blakes pulled the vehicle over and parked. Officer Gregory Iamartino, who was driving an unmarked vehicle, exited his vehicle and went to the driver's side of Nevarez' car. When Nevarez noticed Iamartino, [Nevarez] placed an item into his mouth and swallowed it. Iamartino saw a glass crack pipe and two small bags of what appeared to be crack cocaine in the center console of the vehicle between Nevarez and Blakes. Iamartino relayed back to LaMaine that the car was stopped and suspected narcotics were seized. A subsequent field test performed by Officer Nicole Donawa yielded a positive result for the presence of crack cocaine and heroin in the drugs found in the car.

"LaMaine called in additional units of the narcotics team, which then entered Washington Park and arrested the defendant and Vargas. When officers approached the defendant, he did not attempt to run away or resist arrest, and no contraband was found on him. Officer Barbara Gonzalez searched Vargas and, after noticing the top of a plastic bag sticking out of the top of her pants, discovered a plastic bag containing what

appeared to be small parcels of narcotics concealed in her pants. Gonzalez also found $25 on Vargas. The substances in the bags were field tested and subsequently sent to the state [Controlled Substances and Toxicology Laboratory] where the substances tested positive for cocaine and heroin.

"The state charged the defendant . . . with one count of possession of narcotics with intent to sell in violation of § 21a-277 (a), one count of possession of narcotics with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b), one count of conspiracy to possess narcotics with intent to sell in violation of §§ 53a-48 (a) and 21a-277 (a), and one count of conspiracy to possess narcotics with intent to sell within 1500 feet of a school in violation of [§§ 53a-48 (a) and] 21a-278a (b)." (Footnotes omitted.) *State* v. *Martinez*, supra, 143 Conn. App. 544–46.

The defendant elected to be tried by a jury. During pretrial proceedings, the defendant filed a motion to suppress $60 found in his possession because the money was seized without a warrant. The trial court granted the motion and ordered that "the $60 will not be the subject of testimony during the trial."

Approximately one week later, the defendant filed a motion in limine in which he sought to preclude the state and its witnesses from referring, directly or indirectly, to " 'deal[s],' " " 'transaction[s],' " or " 'hand-to-hand drug exchange[s]' " between the defendant and any other person because such terms implied an exchange of money for drugs and thus would be highly prejudicial. The court denied the motion, explaining that "the motion to suppress has been won, and it will keep the state from introducing any evidence whatsoever that [the police] found any money on your client, and it permits you to argue they didn't find any money on him; the absence of evidence of a transaction."

The following day, defense counsel renewed her argument that testimony referring to a transaction between the defendant and another person would suggest that money had been exchanged in violation of the suppression order. When counsel further noted that it would be unfair for the defense to suggest that no money was found on the defendant because money was found but suppressed, the court responded: "But you could argue at closing, can't you, the absence of money?" Counsel replied that this might misstate the evidence because money in fact was found on the defendant, to which the court replied that "[i]t doesn't misstate the evidence" and that counsel was "certainly . . . free to argue it . . . at closing." The following colloquy then ensued:

"The Court: . . . I think you can argue that no money was found on [the defendant] at closing if there's no evidence—that you didn't hear evidence of any cash

found on him.

"[Defense Counsel]: Exactly. And that—that's probably the furthest I could go with that because that's the actual state of affairs, that there was a legal operation here that kept—

"The Court: You didn't hear any evidence—

"[Defense Counsel]: Keeps—

"The Court: Right?

* * *

"The Court: And you can do that, and that's pretty powerful, which is why you won the motion to suppress. I assume that's why you filed it in the first place.

"[Defense Counsel]: It is—it is powerful, Your Honor.

"The Court: All right."

The court reiterated that it was denying the defendant's request in his motion in limine to preclude the parties from referring, directly or indirectly, to " 'deal[s],' " " 'transaction[s],' " or " 'hand-to-hand drug exchanges' " before ruling as follows: "The court's ruling suppressing the money does only that—it suppresses the evidence seized. . . . And the state cannot refer to the money that [was] seized from the defendant. And [defense counsel] and the defense are free to argue at closing that there was no evidence of money found on the defendant.

"The fact that the state cannot use the evidence of the money seized does not mean that the state can't introduce other evidence of exchanges in conduct between the parties as observed by the officers as evidence that the parties were engaged in a . . . transaction. The jury, if evidence is introduced, might find or draw inferences supporting a finding of transactions. It, of course, will depend on the evidence.

"But, while the defendant may argue the absence of money on him, the defendant cannot use the motion to suppress to preclude the state from introducing other evidence that it may have of a transaction. If the state chooses to call it a transaction, a buy, a sale, and does not introduce evidence to support it, then it's up to the defense to make those arguments at closing and to ask the jury whether the reference to the term deal, buyer, [or] transaction [is] . . . reasonable in light of whatever evidence they admit." At no time during the extensive discussion that preceded this ruling did the prosecutor indicate that he did not understand the limits placed by the trial court on the parties' closing arguments.

The prosecutor subsequently contended in closing argument: "If you're gonna go into a park, the evidence would suggest that you're gonna go into a park and sell narcotics, or conspire to sell narcotics with intent to

sell—have narcotics with intent to sell in a park. It is very logical that one of the first things you want to do if you [are the defendant] in a case like this is to make sure that the drugs are on your coconspirator and that the money's on your coconspirator. Now, when that prospective buyer, Nevarez, comes up, he goes—he goes to [the defendant]. And the reason he goes to [the defendant] and not [to] Vargas is [the defendant] is calling the shots. He goes to him, he goes over to . . . Vargas; they're doing something together. And then Nevarez walks away . . . ."

After the prosecutor stated that LaMaine, who had been observing the defendant and Vargas through his binoculars, summoned some nearby officers to stop Nevarez' car and search for narcotics, he continued: "And then Officer Gonzalez comes in with the rest of the police officers, and what does . . . Officer Gonzalez find in the hands of . . . Vargas: . . . the narcotics identified by the state narcotics lab. You can look at this, and you can take [a] close look [at] it; it's narcotics, it's illegal substances, and it was found on . . . Vargas. And it was also, as Officer Gonzalez testified, $25 found on . . . Vargas.

"Ladies and gentlemen of the jury, that . . . is the state's case. [The] state is content to rest this case with you on the strong evidence of what Lieutenant LaMaine observed that day, and how quickly [the officers] moved in, and what they found. It's clear that [the defendant] and . . . Vargas were acting in a conspiracy to possess narcotics with intent to sell based on the evidence that you've heard. Now, the judge is also gonna instruct you on something called overt acts, and they're a number of overt acts in this case. One . . . possible overt act is the getting of the items from Vargas; [the defendant] got items from Vargas; the handing of the item or items to Nevarez; and then [the defendant's] taking money in exchange for the items [to] Nevarez.

"Now, one may say, well, why wasn't there any money found on [the defendant]? Well, if you're setting up an operation in a park, you want to make sure that the drugs and the money are found on the coconspirator; it makes sense. When the police moved in, they found it on the coconspirator. And that in essence is the state's case."

Defense counsel then approached the bench for a sidebar conference. Thereafter, during closing argument, she contended, among other things, that there was no evidence that the defendant and Nevarez had exchanged money or drugs. In making this argument, counsel referred at least four times to LaMaine's testimony that he saw no money exchanged.[1] Counsel subsequently added, "[m]aybe [the prosecutor] can explain to you why [the defendant] was doing all of these things in exchange for no money at all," thus turning what had been multiple references to LaMaine's testimony

into a statement that the defendant had received no money during the exchanges with Nevarez.

Following defense counsel's argument and the jury's departure from the courtroom, the court stated that it wanted to put its conversation with counsel during the sidebar conference on the record. The trial court noted, and defense counsel confirmed, her objection to the prosecutor's argument that no money was found on the defendant, that the money was carried by Vargas and that the two were involved in a conspiracy. Defense counsel stated that this was not a proper argument in light of the court's suppression of evidence that money was found on the defendant because suppression cannot be used "as both a shield and a sword . . . ." Defense counsel further explained that the prosecutor, having been told he could not present certain evidence, should not have been allowed to use the lack of such evidence against the defendant.

The court also stated for the record that it had asked defense counsel if she wanted the court to take any action before her closing argument but that counsel had declined because she did not wish to highlight or hint that any money was found on the defendant. The court reflected: "It's interesting because it is precisely what you wanted to argue to the jury, but we had a discussion about the fact that the [court's suppression of] the money does not give the defense the right to say there was no money found on him. You could allude—you could make the argument that there's— you've heard no evidence . . . of any money found on him, but you couldn't affirmatively say no money was found on him." The court added, and defense counsel agreed, that she was not objecting to this argument because it would not hurt the defendant but, rather, because it would be an argument the defense would want to make.

In an attempt to further clarify defense counsel's objection, the court stated: "What you're arguing is that then to take that and say that . . . the reason . . . the coconspirator had the money [is] because it's part and parcel [of] a conspiracy; [the defendant] is running the show and, therefore, [Vargas] has the drugs and the money on her. . . . Is [that] what you're objecting to?" After defense counsel agreed that she was objecting to this argument, the court asked: "What if [the prosecutor] had made that argument without referencing whether any money was found on the defendant . . . ? In other words, the state could certainly argue . . . like [it] did with the drugs . . . [that] the drugs are on [Vargas] because that's [the state's] theory of the case. That's how these things go down. Sort of the leader doesn't want to be held left . . . holding drugs, and so they give it to a coconspirator." Defense counsel responded that, if the prosecutor had made this argument without reference to the absence of money on the

defendant, she did not believe she would have objected. She reiterated that her objection was to "the specific reference to a lack of money on [the defendant], which we know was not the case." In response to the trial court's query as to the type of relief she was seeking, such as a limiting jury instruction, defense counsel stated that she did not believe a limiting instruction would be helpful but indicated she was preserving her right to appeal on that issue.

Defense counsel also moved for a mistrial. The prosecutor defended his argument as proper because it was intended to explain why money and drugs were found on Vargas rather than on the defendant. The prosecutor stated that he did not believe he had mischaracterized the facts because he did not mention that $60 was found on the defendant. He acknowledged the difference between arguing that there was no money found on the defendant versus arguing that there was no evidence of money found on the defendant, but stated that he did not believe he would have objected if defense counsel had made the same argument. The trial court denied the motion for a mistrial because it did not believe that the prosecutor's argument "would prejudice the defendant in the totality of how the statements were made . . . ." The court explained that the prosecutor's comment that no money was found on the defendant was in the context of his theory that, as the person calling the shots in a conspiracy with Vargas, the defendant would want to make sure that the drugs and money were on his coconspirator and not on himself. The court opined that the prosecutor could have made the same argument without reference to the fact that no money was found on the defendant because he was saying, in effect, that all of the money the two possessed consisted of the $25 found on Vargas.

At the close of the evidence, defense counsel moved for a judgment of acquittal, claiming that the state had not proven the charges beyond a reasonable doubt. The trial court denied the motion. After closing arguments, defense counsel moved again for a judgment of acquittal or for a new trial. The court denied that motion as well. The jury found the defendant guilty of possession of narcotics with intent to sell and conspiracy to possess narcotics with intent to sell, but not guilty on the counts related to being within 1500 feet of a school. The trial court sentenced the defendant to concurrent terms of twelve years incarceration on the possession and conspiracy counts, execution suspended after five years, and five years of probation.

The defendant appealed to the Appellate Court, which reversed the judgment of conviction and remanded the case for a new trial. *State* v. *Martinez*, supra, 143 Conn. App. 543, 581. The Appellate Court agreed with the defendant that, in view of the trial court's suppression order, the prosecutor's claim during

closing argument that no money was found on the defendant was improper. Id., 570, 577. The court also agreed with the defendant that the prosecutor improperly urged the jurors to draw conclusions lacking in evidentiary support when he suggested, without the introduction of any expert testimony regarding the custom and practice of drug dealers, that it would be " 'logical' " and " '[make] sense' " for the defendant to ensure that the drugs and money were held by his coconspirator, thus rendering the trial fundamentally unfair. Id., 570, 572, 577–78, 580. The state appealed to this court from the judgment of the Appellate Court, claiming that the prosecutor's remarks were not improper.

The governing legal principles are well established. "[T]he touchstone of due process analysis in cases of alleged prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial impropriety] we must view the prosecutor's comments in the context of the entire trial. . . .

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [an impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived [the] defendant of his due process right to a fair trial. Put differently, [an impropriety is an impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 279, 96 A.3d 1199 (2014).

"As we previously have recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case.

[The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 611–12, 65 A.3d 503 (2013). Mindful of these principles, we consider each of the state's claims in turn.

## II

### A

The state first claims that the prosecutor did not violate a clear court order but reasonably interpreted the court's remarks as allowing him to argue that there was no money, an absence of money or no evidence of money found on the defendant.[2] The state also claims that it is not improper, when evidence of money has been suppressed, to ask the jury to infer that no money was found on the defendant. The defendant responds that the prosecutor violated a clear court order concerning the permissible boundaries of argument and made factual assertions to the jury he knew were untrue when he stated that no money was found on the defendant. We agree with the defendant.

In considering the prosecutor's question during closing argument, "[w]hy wasn't there any money found on [the defendant]," the Appellate Court concluded that, although "the [trial] court's instructions to counsel could be fairly read as sending mixed signals regarding the extent to which counsel could refer to the absence of money being found on the defendant's person . . . consideration of all the court's remarks on this subject, as well as the undisputed legal effect of suppressing the evidence of the money found on the defendant's person . . . left . . . the distinct impression that the [trial] court . . . intended to [only] allow argument that there was no evidence of money found on the defendant and not, as argued by the state, that the defendant actually was not in possession of any funds." *State* v. *Martinez*, supra, 143 Conn. App. 576–77. The Appellate Court thus concluded: "[T]he prosecutor's

argument that 'no money was found on the defendant' falls outside the bounds of the permissible argument set by the [trial] court." Id., 577.

As previously noted, the trial court addressed the boundaries of permissible argument two different times during the pretrial proceedings: first, when it granted the defendant's motion to suppress evidence of the $60 found on the defendant; and, second, when it denied the defendant's motion in limine seeking to prohibit the use of certain terms, such as " 'deal[s],' " " 'transaction[s],' " or " 'hand-to-hand drug exchange[s],' " that might suggest to the jury that the defendant received money in exchange for drugs. It is undisputed that the suppression order was not violated and that the trial court permitted the parties to use the language that was challenged in the motion in limine during their closing arguments. Accordingly, we must examine the trial court's instructions to counsel during the two day hearing on the motion in limine.

Having reviewed the record of that hearing, we conclude that the trial court clearly instructed that, although the parties would not be allowed to argue that no money was found on the defendant, they would be allowed to argue that the jury had heard no evidence that money was found on the defendant. On the first day of the hearing, the court advised the parties that it would allow references by the state and its witnesses to "transactions" and "exchanges" but that the state would not be allowed to introduce evidence that the police found money on the defendant. It then added that defense counsel would be permitted to argue that "they didn't find any money on [the defendant]; the absence of evidence of a transaction."

When the hearing continued the following day, defense counsel argued that it would be unfair to contend that no money was found on the defendant, given that money was found but suppressed. The court responded that counsel would not be misstating the evidence if she argued "the absence of money," but, after a lengthy discussion, the court concluded: "I think *you can argue that no money was found on [the defendant] at closing if there's no evidence—that you didn't hear evidence of any cash found on him.*" (Emphasis added.) Defense counsel confirmed this was "probably the furthest [she] could go with that because that's the actual state of affairs . . . ." The court agreed, stating: "*You didn't hear any evidence . . . [r]ight?*" (Emphasis added.) In its subsequent ruling on the motion in limine, the court again explained: "The court's ruling suppressing the money does only that—it suppresses the evidence seized. . . . And the state cannot refer to the money that [was] seized from the defendant. And [*defense counsel*] *and the defense are free to argue at closing that there was no evidence of money found on the defendant.*" (Emphasis added.) The court then

stated that, although "the defendant [could] argue the absence of money on him," the defendant could not preclude the state from using other evidence to demonstrate the occurrence of a transaction, a buy or a sale.

In sum, after defense counsel expressly challenged the trial court's instruction on the first day of the hearing that the motion to suppress permitted counsel to argue that "they didn't find any money on [the defendant]; the absence of evidence of a transaction," the court stated four times on the second day of the hearing that defense counsel would be allowed to argue that no money was found on the defendant as long as she specified "*there was no evidence* of money found on the defendant." (Emphasis added.) Although the court also stated in its last comment on the subject that defense counsel could argue "the absence of money on [the defendant]," this was very likely an unintended slip of the tongue. Immediately prior to this comment, the court had engaged in a lengthy discussion with defense counsel during which counsel repeatedly expressed concern that it was unfair to make an argument to the jury that was clearly untrue. Accordingly, the court's multiple references to the fact that the argument could be made if clothed in the qualifying language should have been apparent to everyone present at the hearing. Indeed, this appears to have been the case because the prosecutor never sought further clarification on the ground that the instructions were unclear. We therefore conclude that the trial court's instructions were unambiguous following its extended colloquy with counsel and that the prosecutor's argument was improper.[3]

### B

The state next claims that the prosecutor did not improperly argue facts outside the record that were not common knowledge and that required expert testimony regarding the custom and practice of drug dealers when he stated that it is "logical" and "makes sense" for the defendant to have his coconspirator hold any drugs or money involved in a transaction so as to avoid being implicated.[4] The defendant responds that the prosecutor's argument was improper because the modus operandi of drug dealers is not common knowledge and the prosecutor introduced no evidence or expert testimony that the custom or practice of drug dealers is for a coconspirator to hold the drugs and money. We agree with the state.

The Appellate Court concluded that "there was no evidentiary support for the prosecutor's argument that conspirators who traffic in drugs are known to place the drugs and cash on their coconspirator"; *State* v. *Martinez*, supra, 143 Conn. App. 577–78; and that this practice was a "typical behavior of drug dealers . . . ." Id., 579. The court thus determined that "[i]t was . . . improper for the prosecutor to argue this inference to the jury without such evidentiary support." Id., 578.

It is well established that "[a] prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . [W]hen a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 746, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). Thus, when a prosecutor claims that a defendant's conduct is consistent with that of a typical drug dealer, this court has recognized that expert testimony on the common practice of drug dealers may assist the jury in determining whether the defendant fits that profile. See, e.g., *State* v. *Vilalastra*, 207 Conn. 35, 42, 540 A.2d 42 (1988); see also *State* v. *Waden*, 84 Conn. App. 147, 153–54, 852 A.2d 817 ("the state presented expert testimony that it is common for a street level drug dealer to keep a 'stash' of narcotics in an area close to where he is selling, rather than [to] have a significant quantity on his person"), cert. denied, 271 Conn. 916, 859 A.2d 574 (2004); *State* v. *Ogrinc*, 29 Conn. App. 694, 699–700, 617 A.2d 924 (1992) (state presented expert testimony by police officer regarding common practice of drug dealers, including quantity of narcotics included in each package and method of packaging).

In the present case, we agree with the state that no expert testimony was required in this case because the Appellate Court improperly characterized the prosecutor's closing argument. The Appellate Court understood his argument as referring to the modus operandi of drug dealers generally, a matter on which no evidence had been offered. The Appellate Court thus viewed the prosecutor as claiming that "conspirators who traffic in drugs are known to place the drugs and cash on their coconspirator"; *State* v. *Martinez*, supra, 143 Conn. App. 578; and that the defendant was engaging in behavior "typical" of drug dealers when he made sure incriminating evidence of drugs and money was held by his coconspirator. Id., 579. The Appellate Court, however, misstated the prosecutor's argument.

The prosecutor made no reference to the common practice of drug dealers, nor did he compare the defendant's behavior to that of drug dealers generally. The prosecutor focused exclusively on the conduct of the defendant and asked the jurors to put themselves in the defendant's position and to apply their own personal knowledge of human nature and behavior in order to understand why he may have done certain things in the course of the transactions to avoid possible arrest. Thus, the prosecutor argued: "It is very logical that *one of the first things you want to do if you* [*are the defendant*] *in a case like this is to make sure that the drugs are on your coconspirator and that the money's*

*on your coconspirator.* Now, when that prospective buyer, Nevarez, comes up, he goes—he goes to [the defendant]. And the reason he goes to [the defendant] and not [to] Vargas is [the defendant] is calling the shots. He goes to him, he goes over to . . . Vargas; they're doing something together. And then Nevarez walks away . . . ." (Emphasis added.)

Shortly thereafter, the prosecutor employed the same rhetorical device when he argued as follows: "Now, one may say, well, why wasn't there any money found on [the defendant]? Well, *if you're setting up an operation in a park, you want to make sure that the drugs and the money are found on the coconspirator; it makes sense. When the police moved in, they found it on the coconspirator.* And that in essence is the state's case." (Emphasis added.)

Jurors, "[i]n considering the evidence introduced in a case . . . are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life . . . ." (Internal quotation marks omitted.) *State* v. *King*, 289 Conn. 496, 522, 958 A.2d 731 (2008). In the present case, the prosecutor was not referring to the common practice and modus operandi of drug dealers who work with coconspirators, which would have constituted facts unsupported by the evidence. Rather, he was asking the jurors to rely on their own experience, intuition and common sense in order to understand why the defendant might have wanted to make sure that the drugs and money were on Vargas. Accordingly, we conclude that the prosecutor did not argue facts outside the record and beyond the common knowledge of the jurors that would have required expert testimony when he stated that it is "logical" and "makes sense" that the defendant would want to ensure that his coconspirator held the drugs and money involved in the transaction.

### III

Having concluded that one of the prosecutor's arguments was improper, we now consider whether the improper argument deprived the defendant of his due process right to a fair trial. In conducting this inquiry, we are guided by the factors enumerated by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). "These factors include the extent to which the [impropriety] was invited by defense conduct or argument, the severity of the [impropriety], the frequency of the [impropriety], the centrality of the [impropriety] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Ruffin*, 316 Conn. 20, 28, 110 A.3d 1225 (2015). "[A] reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a

fair trial unless the [impropriety] is viewed in light of the entire trial." (Internal quotation marks omitted.) *State* v. *Andrews*, supra, 313 Conn. 280. "The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 396, 897 A.2d 569 (2006).

Upon application of the *Williams* factors to the prosecutorial impropriety in the present case, we conclude that the defendant was not deprived of his due process right to a fair trial. Although the prosecutor's comment that no money was found on the defendant was not invited by the defense, this impropriety was more than offset by the fact that the comment was never repeated and was not particularly severe. Although the trial court and defense counsel properly distinguished between arguing that there was no money found on the defendant and arguing that there was no evidence of money found on the defendant, most of the jurors very likely would have found the two arguments to have been indistinguishable because they were both exculpatory. Moreover, because the trial court's order precluding the parties from arguing that no money was found on the defendant benefited the state more than the defendant, violation of the order assisted the defense because it made the state's case more difficult to prove. In addition, the prosecutor's argument was not necessarily any more prejudicial than the argument that the court permitted—that there was no evidence of money on the defendant—because referring directly to there being a lack of evidence might have caused the jurors to wonder whether the defendant had managed surreptitiously to conceal or discard any money he may have received in the transaction with Nevarez. Defense counsel herself suggested this possibility when she rejected a curative instruction by the court that the prosecutor had misspoken and that the more accurate statement was that there was no evidence of money found on the defendant. Finally, defense counsel made a comment very similar to the comment of the prosecutor during her closing argument when she argued that the prosecutor should explain "why [the defendant] was doing all of these things in exchange for no money at all," which is hardly less egregious than the prosecutor's rhetorical question, "well, why wasn't there any money found on [the defendant]?" Accordingly, the second and third *Williams* factors, the frequency and severity of the prosecutorial impropriety, weigh in favor of the state.

The fourth *Williams* factor also weighs in favor of the state. A critical issue in the case was whether the defendant accepted money from Nevarez in exchange for drugs. Thus, any argument by either party referring to an absence of money on the defendant was related to this issue. The prosecutor, however, was precluded

from arguing that $60 was found on the defendant in light of the trial court's ruling on the defendant's motion to suppress. The prosecutor therefore argued that no money was found on the defendant because, as the leader of the coconspiracy with Vargas, he wanted to protect himself by ensuring that any drugs or money involved in the transaction was held by Vargas. As previously discussed, Vargas was found in possession of $25 and drugs matching those found in the car Nevarez was driving when he subsequently was apprehended by the police. Under this theory, which the trial court did not deem improper,[5] whether the prosecutor argued that there was no money found on the defendant or no evidence of money found on the defendant is irrelevant because both arguments make exactly the same point. Indeed, it might have been more damaging to the defendant's case if the prosecutor had argued that there was no evidence of money found on the defendant because specifically referring to the lack of evidence might have led the jurors to believe that, even if no evidence had been found, the defendant might have received money in a drug transaction that he managed to convey to Vargas before the police confronted him.

The fifth *Williams* factor is the strength of the curative measures adopted by the court. In the present case, although the trial court offered to give the jury a curative instruction regarding the prosecutor's comment, defense counsel rejected such an instruction as potentially damaging because it might suggest to the jury that money was found on the defendant. Defense counsel thus prevented the trial court from correcting the prosecutor's error by instructing the jury that there was no evidence of money found on the defendant or that the jury must ignore the prosecutor's argument to the extent it relied on the improper comment, even though such an instruction could have been given without significant emphasis during the court's general summation of the evidence. Accordingly, the lack of a curative instruction in this case does not weigh against the state.

The last *Williams* factor, the strength of the state's case, clearly weighs in favor of the state. The state explained in its closing argument that it was relying principally on LaMaine's observations of the defendant and Vargas, on the rapidity with which the other officers moved in on the defendant and Vargas following their interactions with Nevarez and another unidentified individual, and on evidence of drugs and cash found on Vargas. In addition, there was evidence that the park in which the defendant and Vargas were found was known for drug activity, that Nevarez appeared to be inspecting something in his hand while he was walking away from the defendant and Vargas, that Nevarez put something in his mouth and swallowed it when he saw the officer approach his car following his meeting with the defendant and Vargas, and that narcotics similar to those found on Vargas were found in Nevarez' car. Thus,

although LaMaine was unable to see exactly what the defendant, Vargas and Nevarez were exchanging with one another, the foregoing circumstantial evidence strongly suggested that the defendant had engaged in a drug transaction.

The defendant draws our attention to three cases he deems persuasive from other jurisdictions, holding that prosecutorial improprieties deprived those defendants of a fair trial. See *Berger* v. *United States*, 295 U.S. 78, 88–89, 55 S. Ct. 629, 79 L. Ed. 1314 (1935); *United States* v. *Forlorma*, 94 F.3d 91, 93–94 (2d Cir. 1996); *State* v. *McSwine*, 22 Neb. App. 791, 800–801, 860 N.W.2d 776 (2015). The prosecutorial improprieties in those cases, however, were far more egregious than the impropriety in the present case.[6] Accordingly, we conclude, following our review of the *Williams* factors, that there is no reasonable likelihood that the prosecutor's comments in the present case affected the jury's verdict.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion ROGERS, C. J., and ESPINOSA and VERTEFEUILLE, Js., concurred.

[1] Defense counsel first argued: "What did [LaMaine] testify to here; he saw no money exchanged. Not only did he not see crumpled money, he didn't see any money exchanged at all. He didn't even testify that he thought that, maybe, he saw money. You see what I'm saying: no money at all." Counsel later added, with respect to the lack of direct evidence: "Maybe [the prosecutor] can explain to you why you should disbelieve the testimony of Lieutenant LaMaine, who admitted . . . very forthrightly, very openly, he couldn't hear anything, he didn't see any drugs, he didn't see any money, he didn't see any furtive hand movements, [and] he didn't see any secretive behavior."

[2] The defendant acknowledges in his brief to this court that, even though the trial court was primarily addressing defense counsel's concerns during the hearing on the motion in limine and, "even though the court did not specifically state that the prosecutor was also free to argue that there was no evidence of money found on the defendant, obviously, the [prosecutor] was free to do so." Accordingly, the trial court's comments regarding the limits of closing argument were directed to both parties.

[3] In light of our ultimate conclusion that the prosecutor's reference to the absence of money on the defendant did not render the trial fundamentally unfair; see part III of this opinion; we need not address the state's related claim that asking the jury to infer that the defendant had no money on his person, when the money was suppressed, was not improper.

[4] The dissent argues that the prosecutor "compounded" his initial error of arguing that there was no money found on the defendant "by implying to the jury that all of the drugs and the money were in the possession of the defendant's alleged coconspirator, [Vargas], in order to support the state's theory that the defendant, acting as the ringleader, sought to exculpate himself by sequestering all of the contraband—both the drugs and the money—with Vargas." (Emphasis omitted.) The dissent claims that the prosecutor improperly advanced this theory when he argued to the jury that it " 'makes sense' that the defendant would place the drugs and money in Vargas' possession"; (emphasis omitted); thus "asking the jury to draw an inference based on a fact that he knew [to be] false." We disagree.

First, the dissent disregards uncontroverted evidence that Vargas was in possession of both drugs and $25 at the time of the defendant's arrest. Accordingly, the prosecutor's statement that the police found drugs and money on Vargas was accurate.

Second, the prosecutor did not argue that "all" of the drugs and the money were found on Vargas. Rather, the prosecutor argued that it was "logical" to believe that a coconspirator like the defendant would "make sure that

the drugs are on your coconspirator and that the money's on your coconspirator." The prosecutor further argued: "Now, one may say, well, why wasn't there any money found on [the defendant]? Well, if you're setting up an operation in a park, you want to make sure that the drugs and the money are found on the coconspirator; it makes sense. When the police moved in, they found it on the coconspirator. And that in essence is the state's case." At no point in this argument did the prosecutor claim that *all* of the money and the drugs were found in Vargas' possession.

Third, the trial court did not rule that the prosecutor could not argue that the police found drugs and money on Vargas, nor did the court preclude the prosecutor from drawing any inferences from this fact regarding the conspiratorial relationship between Vargas and the defendant. The court instead queried defense counsel as to whether she would disagree with an argument by the prosecutor that the defendant's coconspirator had "the drugs and the money" on her because she was part of a conspiracy with the defendant in which the defendant was running the show. Defense counsel initially responded that, if the prosecutor had made this argument without reference to the absence of money on the defendant, she did not believe that she would have objected. She then added that her objection was to "the specific reference to a lack of money on [the defendant], which we know was not the case." In claiming that the prosecutor could not draw an inference regarding the conspiratorial relationship between the defendant and Vargas from the fact that Vargas was in possession of drugs and money, the defendant in effect seeks to suppress the evidence found on Vargas and the reasonable inferences that can be drawn therefrom. The trial court's order suppressing the evidence found on the defendant, however, did not and could not extend to the drugs and money found on Vargas. Thus, the harm caused by the prosecutor's argument that no money was found on the defendant was not significantly compounded by the prosecutor's remark that it "makes sense" that the defendant, acting as the ringleader, would have ensured that Vargas was in possession of the drugs and the money. The jury could have concluded that the defendant and Vargas were involved in a conspiracy simply on the ground that Vargas was in possession of $25 and drugs. In other words, the defendant's due process right to a fair trial was not appreciably affected following the prosecutor's initial remark that no money was found on the defendant by his subsequent statement, in furtherance of his conspiracy theory, that it "makes sense" that drugs and money were found on Vargas.

[5] As previously noted, the trial court conducted an extensive discussion with defense counsel following closing argument during which counsel contended that the prosecutor not only should have been precluded from arguing that no money was found on the defendant, but also from arguing that the reason there was no evidence of money found on the defendant was because he wanted to ensure that the money and drugs were in Vargas' possession. The defendant also makes this argument on appeal. The defendant, however, never raised this issue during the hearing on the motion in limine, and, consequently, the trial court never had the opportunity to consider it before the parties' closing arguments, and there was no court order or instruction in place to preclude the prosecutor from making the argument before the prosecutor gave his summation. Furthermore, when defense counsel finally raised the issue for the first time following closing arguments in the context of the motion for a mistrial, the trial court dismissed it, explaining that the prosecutor could have made a similar argument that the defendant wanted to ensure that the money and drugs were on his coconspirator, Vargas, without referring to the absence of money on the defendant. We agree with the trial court's reasoning and, therefore, reject the defendant's claim on both of the foregoing grounds.

[6] See *Berger* v. *United States*, supra, 295 U.S. 84–85, 89 (prosecutor engaged in "pronounced and persistent" misconduct during cross-examination and argument, including "misstating the facts in his cross-examination of witnesses . . . putting into the mouths of such witnesses things which they had not said . . . suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered . . . pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness [on] that basis . . . assuming prejudicial facts not in evidence . . . bullying and arguing with witnesses . . . and . . . [presenting arguments that were] undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury"); *United States* v. *Forlorma*, supra, 94 F.3d 93–94 ("the prosecutor's repeated baseless argument that a suit fitting

[the defendant] was in [a] bag with the heroin at the time of his arrest . . . reinforc[ed] the inference of [the defendant's] awareness of the heroin concealed in the bag" and likely influenced jury's verdict, thus depriving defendant of fair trial); *State* v. *McSwine*, supra, 22 Neb. App. 800–801 (prosecutor's repeated, misleading comments during closing argument challenging defendant's rationale for his potentially incriminating text messages deprived defendant of right to fair trial because comments could have served as basis for jury determination that defendant lacked credibility and thus was guilty of crime).